[Cite as *State v. Renner*, 2013-Ohio-5463.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| Plaintiff-Appellee | : | C.A. CASE NO. 25514 |
| v. | : | T.C. NO. 12CR219 |
| WILLIAM I. RENNER III | : | (Criminal appeal from Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

**O P I N I O N**

Rendered on the ___13th___ day of ___December___, 2013.

. . . . . . . . . .

ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
   Attorney for Plaintiff-Appellee

BRENT E. RAMBO, Atty. Reg. No. 0076969, 15 W. Fourth Street, Suite 250, Dayton, Ohio 45402
   Attorney for Defendant-Appellant

. . . . . . . . . .

FROELICH, J.

  **{¶ 1}** William I. Renner III was found guilty by a jury of domestic violence,

a misdemeanor, and abduction, a third-degree felony; he was acquitted of several additional charges. The trial court sentenced Renner to concurrent sentences totaling 36 months in prison. Renner appeals from his convictions, raising eight assignments of error. For the following reasons, the trial court's judgment will be affirmed.

## I. Sufficiency of the Evidence and Manifest Weight
## of the Evidence Regarding the Abduction Count

**{¶ 2}**    Renner's first and fifth assignments of error state:

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S RULE 29 MOTION AS TO THE ABDUCTION COUNT.

APPELLANT'S CONVICTION ON THE ABDUCTION COUNT WAS ENTERED AGAINST THE WEIGHT OF THE EVIDENCE.

**{¶ 3}**    Renner claims that his conviction for abduction was based on insufficient evidence and was against the manifest weight of the evidence.

**{¶ 4}**    "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). When reviewing whether the State has presented sufficient evidence to support a conviction, the relevant inquiry is whether any rational finder of fact, after viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). A guilty verdict will not be disturbed on appeal unless "reasonable

minds could not reach the conclusion reached by the trier-of-fact." *Id.*

{¶ 5} In contrast, "a weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *Wilson* at ¶ 12. *See Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19 ("'manifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion"). When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 6} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). However, we may determine which of several competing inferences suggested by the evidence should be preferred. *Id.* The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717.

{¶ 7} Renner claims that there was insufficient evidence to support his conviction

for abduction because the State's case relied on evidence that was inadmissible. He argues that the State improperly presented prior consistent statements by Angela Renner (the alleged victim), prior inconsistent statements of Angela[1] through the testimony of Officer Bell, and hearsay statements by Angela that were admitted as excited utterances. Renner asserts that, absent this improper testimony, the State did not present sufficient evidence to support his abduction conviction.

{¶ 8} In conducting a sufficiency-of-the-evidence analysis, we need not determine which statements by Angela Renner and Officer Bell were properly admitted by the trial court. The Supreme Court of Ohio has rejected the position that a reviewing court should consider only properly admitted evidence to determine whether the State has presented sufficient evidence to support a conviction. *State v. Brewer*, 121 Ohio St.3d. 202, 2009-Ohio-593, 903 N.E.2d 284, ¶ 1, following *Lockhart v. Nelson*, 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988). Rather, the reviewing court should consider all of the evidence admitted at trial, whether erroneously or not, and double jeopardy does not bar retrial where "trial error" resulted in the improper admission of evidence. *Brewer* at ¶ 17-20. The Supreme Court recognized that the State "may rely upon the trial court's evidentiary rulings in deciding how to present its case." *Brewer* at ¶ 19, citing *Lockhart*; *see State v. Kareski*, _____ Ohio St.3d _____, 2013-Ohio-4008, _____ N.E.2d _____, ¶ 16.

{¶ 9} The State's evidence at trial consisted of testimony from Angela Renner, the complainant; Officer Nicholas Bell, the Miamisburg police officer who encountered Angela

---

[1] We will refer to the complainant by her first name to avoid confusion.

and took her to the hospital; Officer Michael Aiken, the Miamisburg police officer who assisted Officer Bell with evidence collection at the Renners' house; Jack Ikerd, a firefighter/paramedic with the Miami Valley Fire District; Pamela Kraft, an emergency room nurse; Sabrina Herman, a domestic violence social worker with the hospital; Kent Harshbarger, the Montgomery County Coroner (who testified about injury pattern analysis in his capacity as a forensic pathologist); and Detective William Ring, who was assigned to investigate the incident. The State also presented photographs of Angela's injuries and of the Renners' home. At trial, Angela recanted the version of events that she had told to the police and hospital personnel. Accordingly, the State's version of events relied primarily on the evidence presented through the State's other witnesses. For purposes of evaluating Renner's sufficiency and manifest weight arguments, the State's evidence revealed the following facts.

{¶ 10} On January 19, 2012, William "Ike" Renner and his wife, Angela, lived in a house on Cottage Avenue in Miamisburg, Ohio. Per their routine, Renner drove Angela to the Golden Corral Restaurant, where she worked. During her shift, Renner visited Angela at the restaurant, at which time they had a "disagreement." As Renner prepared to leave, he threw a cup out the window of his car and sped out of the parking lot. After Renner left, he disconnected Angela's cell phone. Renner did not come to pick up Angela at the end of her shift, and Angela called her mother, who gave Angela a ride home.

{¶ 11} Angela did not have a key to her house and Renner was not there, so she waited outside until her husband came home. After Renner returned, he opened the door for Angela and pulled her into the kitchen. The house was dark, because the lights had been

broken. Renner "threw" Angela around, punched her in the head, pinned her against the wall and tried to choke her. Renner also slammed Angela's head against the ironing board, which was located in the kitchen, and threw her onto the floor, where she fell onto broken glass. At some point, Angela found herself on the floor of the couple's living room. Renner swung an aluminum baseball bat at her; Angela blocked the blow with her feet. Angela then ran out of the house and hid under a nearby truck.

{¶ 12} At approximately 7:00 p.m., after being under the truck for approximately 30 minutes, Angela waved down a police officer. Angela was crying and shaking, her clothes were torn, and she was not wearing a coat. There were smears of blood on her arms, face, and shirt. Angela told the officer that her husband had "just gone crazy" and that her head hurt. The officer contacted paramedics, and Angela was taken to the hospital. Angela reiterated that she had been attacked by her husband to the firefighter/paramedic, the emergency room nurse who cared for her, and the hospital's domestic violence social worker who spoke with Angela at the hospital, all of whom testified at trial.

{¶ 13} Photographs were taken of Angela at the hospital. There were red marks on Angela's face, the back of her neck, and arm. There were bruises on her hand, head and hip. Angela's right ear was very swollen and abrased, which was "obviously from something hitting her ear." She also had scratches on her back. Angela complained of severe pain, including pain in her head, upper neck, back, and hip. Additional photographs were taken the following day. These photographs showed the development of bruises on several areas of Angela's body.

{¶ 14} The police attempted, unsuccessfully, to locate Renner on January 19.

Renner did not come to the hospital or visit Angela at her parents' house, where Angela went to stay for several days. Renner was ultimately located with Angela in Florida.

{¶ 15} Angela, the first witness at the trial, was called as a court's witness. Angela testified that she had lied to police officers and others when she put the blame on her husband, and she presented a different version of events than what she had said on January 19, 2012. Angela stated that January 19, 2012 was her second day of not smoking, and she became irritated with Renner when he came to her workplace with a buckeye candy instead of a cigarette. They had a "disagreement," and Angela told Renner not to come to her work place in the future.

{¶ 16} Angela testified that, after her mother brought her home, she let herself into the house and was in the kitchen when Renner returned home five or ten minutes later. Renner walked in with a "smile on his face" and said, "I see you made it home." At that point, Angela "threw a fit on him," yelling and asking him "how could he do this." When Renner picked up the couple's wedding certificate and asked if the relationship was over, Angela grabbed a knife or scissors and stabbed at the certificate, but hit Renner's hand instead. Renner grabbed Angela's wrists to make her drop the blade, yelled at Angela, and went out the front door. Angela begged him not to leave. As he went out the door, Angela grabbed a baseball bat and hit the screen door.

{¶ 17} According to Angela, Renner came back into the house and went into the kitchen to grab his car keys. He told Angela that the police would come based on her behavior. The couple had "more words" in the kitchen, and Angela hit the ironing board (which was in the kitchen) with the bat. Renner grabbed the bat to pull it away from her,

and Angela "went flying over the ironing board." In the process, Angela broke the kitchen light. Renner told her, "Let's get out of here. The cops are going to be here." Renner left in the car. Angela left through a different door; Renner had already driven away.

{¶ 18} Renner presented two witnesses on his behalf: a next door neighbor and Angela's mother. The neighbor primarily testified that the Renners had been planning to move to Florida. Angela's mother testified that Angela was a liar and a "drama queen."

{¶ 19} Renner was charged with abduction, in violation of R.C. 2905.02(A)(2), which provides: "(A) No person, without privilege to do so, shall knowingly do any of the following: * * * (2) By force or threat, restrain the liberty of another person under circumstances that create a risk of physical harm to the victim or place the other person in fear." The State presented several witnesses who testified that Angela had reported being pulled into her house by Renner, where he punched her, choked her, threw her against the wall, and hit her with an ironing board and baseball bat. After Angela ran from the house without a coat, she hid under a vehicle until she saw a police cruiser. Angela was crying and shaking, and she had red marks and bruises on her body. Such testimony, if believed, was sufficient to establish that Renner restrained his wife in their house by force under circumstances that created a risk of physical harm to Angela or placed her in fear. Viewing the evidence presented by the State (without regard to whether it was properly admitted) in a light most favorable to it, we find sufficient evidence to support Renner's conviction for abduction.

{¶ 20} Renner further claims that his conviction was against the manifest weight of the evidence. At trial, Angela testified that she had lied to the police and others when she

told them that Renner had attacked her. She testified, instead, that she had been the aggressor. Angela claimed that the photographs reflected rashes or other non-injuries. Renner's neighbor testified that the Renners had been planning to move to Florida (refuting a suggestion that he had fled to Florida), and Renner's mother expressed that she did not believe her daughter's original story about what happened on January 19, 2012. In contrast, the State presented evidence that Renner had dragged Angela inside their home and assaulted her. The credibility of the witnesses and the weight to be given to their testimony were matters for the jury, as the trier of fact, to determine. Considering all of the evidence presented at trial (including any evidence that may have been improperly admitted), the jury did not lose its way simply because it chose to believe the version of events that Angela told on January 19, 2012, rather than at trial.

{¶ 21} Renner's first and fifth assignments of error are overruled.

## II. Court's Witness

{¶ 22} Renner's second assignment of error states:

THE TRIAL COURT ERRED IN CALLING ANGELA RENNER AS ITS OWN WITNESS

{¶ 23} Evid.R. 614(A) provides that "[t]he court may, on its own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called." The purpose of calling a witness as a court's witness is to allow for a proper determination in a case where a witness is reluctant or unwilling to testify. *State v. Curry*, 8th Dist. Cuyahoga No. 89075, 2007-Ohio-5721, ¶ 18. "A witness whose appearance is important to the proper determination of the case, but who appears to be favorable to the

other party, is a principal candidate for application of Evid.R. 614(A)." *Id.*, citing *State v. Brewer*, 10th Dist. Franklin No. 84AP-854, 1986 WL 2652, *3 (Feb. 25, 1986); *State v. Croom*, 2d Dist. Montgomery No. 25094, 2013-Ohio-3377, ¶ 74. The prime candidate is a victim and an eyewitness who will not otherwise cooperate with the party originally planning to call him. *Id.*

**{¶ 24}** We review the trial court's decision to call a witness as a court's witness for an abuse of discretion. *Croom* at ¶ 74, citing *State v. Jones*, 2d Dist. Montgomery No. 14731, 1996 WL 38940, *4 (Jan. 31, 1996). A trial court abuses its discretion when it makes a decision that is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶ 25}** Prior to opening statements, the State moved to call Angela Renner as a court's witness. The prosecutor explained that Angela had not only changed her story, but had also aligned herself with Renner. The prosecutor stated that Angela "talks and visits [Renner] in the jail, she will not speak to us. She actively avoided us for quite some time. So it's more that just a changing story, she is incredibly hostile towards us." The prosecutor further stated that Angela had hung up on the prosecutor and that Angela had made no effort to share any alternative story with the State. Angela failed to appear for the pretrial meeting that the prosecutors had scheduled. Defense counsel and the prosecutor both stated that Angela tried to contact the State prior to Renner's extradition to Ohio to tell the prosecutor that she (Angela) did not want charges pursued against her husband. The trial court granted the State's request over defense counsel's objection.

**{¶ 26}** Upon review of the record, we find no abuse of discretion in the trial court's

designation of Angela Renner as a court's witness pursuant to Evid.R. 614. Angela maintained a supportive relationship with her husband (the defendant), she expressed that she did not want the State to pursue charges against Renner, and she was uncooperative with the State once charges were filed.

{¶ 27}   Renner's second assignment of error is overruled.

### III.   Impeachment with Videotape

{¶ 28}   Renner's third assignment of error states:

THE TRIAL COURT ERRED IN FAILING TO FOLLOW THE CORRECT PROCEDURE WHEN ALLOWING THE STATE TO IMPEACH THE ALLEGED VICTIM WITH A VIDEO TAPE IN THE PRESENCE OF THE JURY

{¶ 29}   In his third assignment of error, Renner claims that the trial court erred in allowing a cruiser video to be played for the jury without first requiring the State to properly authenticate the video. Renner further argues that the video was inadmissible as a prior inconsistent statement because Angela was not afforded an opportunity to admit or deny the contents of the video. Renner did not object to the State's use of the cruiser video on these grounds; accordingly, he has waived all but plain error.

{¶ 30}   "Evid.R. 901(A) requires, as a condition precedent to the admissibility of evidence, a showing that the matter in question is what it purports to be." *State v. Simmons*, 2d Dist. Montgomery No. 24009, 2011-Ohio-2068, ¶ 12.   The threshold standard for authenticating evidence is low, *State v. Wiley*, 2d Dist. Darke No. 2011 CA 8, 2012-Ohio-512, ¶ 11, and Evid.R. 901(B) provides examples of numerous ways that the

authentication requirement may be satisfied. The most commonly used method is testimony that a matter is what it is claimed to be under Evid.R. 901(B)(1). *Royse v. Dayton*, 195 Ohio App.3d 81, 2011-Ohio-3509, 958 N.E.2d 994, ¶ 27 (2d Dist.).

{¶ 31} Angela testified that she remembered being in the back seat of Officer Bell's cruiser after flagging him down on January 19, 2012, but she didn't "really remember what was said." (Tr. 242.) Immediately after that testimony, the State played approximately eight minutes of the video that was recorded in the Officer Bell's cruiser. Afterward, Angela identified her voice on the cruiser video, and both she and Officer Bell testified that the video was a fair representation of what Angela had said to Officer Bell in the cruiser that night. Officer Bell later testified about how the video recorder in the cruiser worked, that he had seen the video, and that the audio portion was a fair and accurate depiction of the conversation with Angela. Defendant's counsel did not object to the admissibility of the cruiser video at the conclusion of the State's case-in-chief. We find no plain error with respect to the authentication of the cruiser video.

{¶ 32} Renner further claims that the cruiser video was improperly used to impeach Angela with prior inconsistent statements, which are hearsay. The State responds: "Had the statements contained on the cruiser-cam video been admitted solely for impeachment, then Renner's argument that the mechanics for the admission of such statements were not properly followed might have merit. But impeachment was not the sole reason – nor the intended reason – for the State's admission of the statements contained on the video. The intended reason was because it documented Angela's excited utterances."

{¶ 33} "Hearsay" is defined as "a statement, other than one made by the declarant

while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). In general, hearsay is not admissible. Evid.R. 802.

{¶ 34} Evid.R. 803 excludes several types of statements from the hearsay rule, including excited utterances, which are "statement[s] relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Evid.R. 803(2). "The rationale for admitting hearsay statements pursuant to the excited utterance exception is that the declarant is unable, due to the startling event, to reflect on the statement sufficiently to fabricate it." *State v. Florence*, 2d Dist. Montgomery No. 20439, 2005-Ohio-4508, ¶ 32.

{¶ 35} Near the beginning Angela's testimony (prior to the State's playing the cruiser video), Angela testified that she recalled waving down a police officer while crying and shaking. Officer Bell was called after Angela (and after the video was played). He testified that, as he was driving on routine patrol, a woman (later identified as Angela) approached him waving her arms. Bell stated that she looked "very upset, very agitated" and "was frantic." Angela did not have a coat, she was clutching her side, and pulling at her shirt. Bell testified that he thought that "something obviously had happened to her, she * * * was freaked out." When Angela got in the cruiser, she spoke very quickly, was crying, and appeared panicky. Angela's tone of voice and breathing while she was in the cruiser were consistent with an excited state.

{¶ 36} Renner is correct that it was improper to play the video in front of the jury without having given Angela the opportunity to give a different version, if its purpose was impeachment. However, the trial court ruled during Officer Bell's testimony that the

statements Angela made in the cruiser were excited utterances. Although Bell's testimony and the court's ruling regarding the hearsay exception should have preceded the playing of the cruiser video, the State's evidence as a whole reflected that Angela's statements to Officer Bell in the cruiser were admissible as excited utterances. We cannot conclude that the trial court committed plain error in allowing the video of those statements to be admitted.

{¶ 37} Renner's third assignment of error is overruled.

### IV. Impeachment with Police Report

{¶ 38} Renner's fourth assignment of error states:

THE TRIAL COURT ERRED IN ALLOWING THE PROSECUTOR TO QUESTION THE ALLEGED VICTIM CONCERNING A PAST POLICE REPORT SHE HAD AUTHORED, WHEN SAID REPORT CONTAINED NO INCONSISTENCY.

{¶ 39} In his fourth assignment of error, Renner claims that the trial court erred in allowing the State to use a 2008 police report to impeach Angela Renner's statement that Renner "did not hit me. He would never hit me. He barely raises his voice at me."

{¶ 40} Prior to the State's presenting Angela with the police report, a sidebar discussion was held, during which the State informed the trial court that it had "a 2008 incident where he [Renner] did almost the exact same thing to her." The State indicated that Renner had not been convicted of any charges in 2008 because Angela would not cooperate, but Angela had filed a report. Over defense counsel's objection, the court ruled that the State could cross-examine Angela about the incident, because Angela had "opened the door."

{¶ 41}  Following the court's ruling, the State elicited the following testimony from Angela:

Q: * * * Do you recall what happened to you back in 2008?  Do you recall making a police report against the Defendant for striking you and beating you in almost the same manner, do you recall that?

A: I do remember that.

Q: Do you remember making a police report that he had beaten you then?

A: Uh-huh.

Q: So, are you saying then that he didn't hurt you in 2008?

A: Ike would never hurt me.

Q: Then why did you make a police report in 2008?

A: I don't know, because I'm not right.

Q: So, you're now saying that you – there's something wrong with you and that he never struck you in 2008 either?

A: When I don't get my way, I tend to throw a fit.  Ike is a great husband, he always has been.

Q: So, are you denying that he struck you back in 2008?

A: We've had arguments before.  We've had disagreements before.  And I don't think it's fair that you're trying to back me into a corner right now with that.

\* \* \*

Q:  – are you denying that you made a report in 2008 that the Defendant had beaten you?

A: No, I'm not going to deny that because you know better.  And I'm not up here to lie to you.

Q: And did you make a report that he had assaulted you then?

A: Yes, ma'am.

Q: Okay.  And are you telling us today that he didn't assault you then at all?

A: We had an argument.

Q: I'm asking you, did he put his hands on you since you said he never laid his hands on you, are you denying that he laid his hands on you in 2008?

A: I can't deny that, I'm under oath.

Q: Okay.

A: But I'm telling you, on January 19th, this didn't happen.

{¶ 42}    Renner claims that the State should not have been allowed to use the 2008 police report to impeach Angela's statement that Renner would never and had never hit her. He argues that the police report would contradict a statement by Angela that she had never *reported* that Renner had hit her, but it did not establish that Renner *had* hit her in the past. Renner thus claims that the 2008 police report was not a prior inconsistent statement and that its use was prejudicial.

{¶ 43}   "Evid. R. 607 permits a party to impeach the credibility of a witness through evidence of a prior inconsistent statement; that is, through proof of a self-contradiction."

*State v. McNew*, 2d Dist. Montgomery No. 22902, 2009-Ohio-5531, ¶ 57. Angela had testified that her husband, Renner, would never hit her. The State's questions about the 2008 police report elicited testimony that Angela had previously asserted that Renner had attacked her. Angela acknowledged that Renner had "laid his hands on" her in 2008. Through these questions, the State impeached Angela's testimony that Renner would never hit her. We note that the trial court instructed the jury in its closing instructions that evidence of other acts by Renner were received for a limited purpose and that the jury was not permitted to consider it to prove Renner's character in order to show that he acted in conformity with that character. We find no prejudicial error in the trial court's ruling that the State could impeach Angela with her prior statements in the 2008 police report.

{¶ 44} Renner's fourth assignment of error is overruled.

### V. Prosecutorial Misconduct

{¶ 45} Renner's sixth assignment of error states:

THE PROSECUTOR COMMITTED REVERSIBLE MISCONDUCT

{¶ 46} In his sixth assignment of error, Renner claims that the prosecutor engaged in misconduct during voir dire, opening statements, and closing statements.

{¶ 47} In reviewing claims of prosecutorial misconduct, the test is whether the prosecutor's remarks were improper and, if so, whether those comments prejudicially affected the substantial rights of the defendant. *State v. Jones*, 90 Ohio St.3d 403, 420, 739 N.E.2d 300 (2000). "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor." *Id.*, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct 940, 71 L .Ed.2d 78 (1982). Where it is clear beyond a reasonable doubt that the jury would

have found the defendant guilty, even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be reversed. *See State v. Underwood*, 2d Dist. Montgomery No. 24186, 2011-Ohio-5418, ¶ 21. We review allegations of prosecutorial misconduct in the context of the entire trial. *State v. Stevenson*, 2d Dist. Greene No. 2007-CA-51, 2008-Ohio-2900, ¶ 42, citing *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

**{¶ 48}** First, Renner claims that the prosecutor engaged in misconduct when he discussed the standard for reasonable doubt, saying that the law does not require that the jurors feel "100 percent certain" of the defendant's guilt before finding the defendant guilty.

**{¶ 49}** During voir dire, the prosecutor asked the prospective jurors if anyone felt that he or she had to feel 100 percent certain before making a finding of guilt. After one prospective juror expressed concerns, the prosecutor explained that "since you weren't there, you're going to be relying on other people to come in and tell you what happened" and that "everything relating to human affairs is open to some doubt." The prosecutor gave an example where four witnesses viewed a car crash and had different versions of what happened, but all agreed that a crash occurred. The prosecutor told the prospective jurors that "the law does not mandate 100 percent certainty, because I can't do that, we cannot do that, because we weren't there either. So hopefully everyone understands that the burden is beyond a reasonable doubt to the elements. Doubt based on common sense and reason." Renner did not object to the prosecutor's statements regarding reasonable doubt.

**{¶ 50}** We have previously commented that the topic of reasonable doubt "is no doubt worthy [of] a law review article. Suffice it to say, we look with disfavor on attorneys'

or judges' uses of examples to illustrate their own subjective conception of reasonable doubt." *State v. Turic*, 2d Dist. Greene No. 2010 CA 35, 2011-Ohio-3869, ¶ 13. The Ohio Revised Code defines the term "reasonable doubt," stating:

"Reasonable doubt" is present when the jurors, after they have carefully considered and compared all the evidence, cannot say they are firmly convinced of the truth of the charge. It is a doubt based on reason and common sense. Reasonable doubt is not mere possible doubt, because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt. "Proof beyond a reasonable doubt" is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of the person's own affairs.

R.C. 2901.05(E). This definition "correctly conveys the concept of reasonable doubt and is not an unconstitutional dilution of the State's burden to prove guilt beyond a reasonable doubt." *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 61. Further attempts to "clarify" the term by example, analogy, metaphor, or simile are ill-advised. *Turic* at ¶ 13.

{¶ 51} In Renner's case, the prosecutor correctly stated that the reasonable doubt standard did not require an absence of all doubt, that the doubt is based on reason and common sense, and that everything related to human affairs is open to some doubt. Although the prosecutor provided an example to illustrate his point, the example did not unfairly mislead the jury. In addition, the trial court instructed the jury following voir dire that the court would set forth the law to be applied to the case, and the court correctly defined

reasonable doubt in the jury instructions prior to deliberations. We cannot find that the prosecutor's comments during voir dire unfairly misled the jury with respect to the State's burden of proof.

{¶ 52} Second, Renner claims that the prosecutor improperly told the jury during voir dire that "[d]omestic violence is not just physical abuse. Does everyone understand that? And again, you'll get the legal definition, but domestic violence can be verbal abuse, mental abuse – everyone agree with that?" Renner argues that he was not charged with inflicting verbal and mental abuse on his wife, and that the prosecutor's comments were "another attempt by the prosecutor to artificially lower the bar with respect to what the jury actually had to find in order to convict [him]." Renner did not object to the prosecutor's statement at trial.

{¶ 53} Following the presentation of evidence, the jury was instructed that Renner was charged with domestic violence, which required a finding that he "did knowingly cause or attempt to cause physical harm to a family or household member, to wit: Angela Renner." The court defined the term "physical harm." Although the prosecutor's reference to mental and verbal abuse was legally incorrect, we find no basis to conclude that Renner was prejudiced by those statements during voir dire.

{¶ 54} Third, Renner argues that the prosecutor engaged in misconduct during opening and closing statements.

{¶ 55} At the outset, we note that the trial court repeatedly advised the jury that opening and closing arguments are not evidence. The court explained that opening statements are a preview of the claims of each party; they outline what the parties expect

their evidence will be and are designed to assist the jury in following the evidence as it is presented. The court stated that closing arguments provide the attorneys an opportunity to tell the jury what they believe the evidence has shown through witnesses and exhibits. The court further instructed the jury to consider only the evidence and to disregard answers that were stricken, and also not to speculate as to why the court sustained any objection. In addition, the court instructed the jury that, if the court did or said anything to indicate the court's view on the facts, the jury must disregard it. We presume the jury followed the court's instructions.

{¶ 56} Renner asserts that the prosecutor improperly stated during opening statements: "Sadly, after all this happened, the Defendant fled to Florida and Angela went right along with him. So after the passage of time and a few apologies, I stand here today and I cannot tell you what Angela is going to tell you when she takes that witness stand. I cannot tell you what she's going to say. *What I can tell you is that she wants nothing more than to protect her husband.*" (Emphasis added.)

{¶ 57} Renner supports his argument with *State v. Clay*, 181 Ohio App.3d 563, 2009-Ohio-1235 , 910 N.E.2d 14 (8th Dist.). In *Clay*, the prosecutor told the jury during opening statements "that the victim was not likely to testify consistently *with her written statement*. He also stated that it was the state, not the victim, who brings charges in these cases. He further discussed the fact that many domestic-violence victims minimize the prior events in an attempt to protect the person with whom they are in a relationship, and he commented on the inconsistency between the victim's earlier account of events and portions of her trial testimony. These comments continued during the presentation of the evidence

and during closing argument." (Emphasis added.) *Id*. at ¶ 42. The Eighth District concluded that the prosecutor's statements were improper because the written statement should not have been admitted as substantive evidence and that "commenting on the veracity of the victim's yet-to-be-heard testimony was improper." *Id*. at ¶ 46.

{¶ 58} As in *Clay*, the prosecutor's statement that Angela "wants nothing more than to protect her husband" commented on Angela's anticipated mindset and not-yet-given testimony. *Clay* is distinguishable in that the prosecutor in *Clay* referenced a specific piece of evidence (the written statement) which should not have been admitted. Nevertheless, the prosecutor's comment regarding Angela was improper for opening statements. When viewed in the light of the entire trial, however, we cannot conclude that the prosecutor's statement affected the outcome of Renner's trial.

{¶ 59} Renner argues that the prosecutor engaged in misconduct during closing arguments in several respects.

{¶ 60} In general, prosecutors enjoy a wide degree of latitude during closing arguments. *State v. Whitfield*, 2d Dist. Montgomery No. 22432, 2009-Ohio-293, ¶ 12. They may freely address what the evidence has shown and what reasonable inferences may be drawn from that evidence. *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990); *State v. Black*, 181 Ohio App.3d 821, 2009-Ohio-1629, 911 N.E.2d 309, ¶ 33 (2d Dist.). "However, prosecutors must refrain from making misleading insinuations and assertions as well as expressing personal beliefs or opinions regarding the defendant's guilt. Prosecutors must also refrain from alluding to matters unsupported by admissible evidence. 'It is a prosecutor's duty in closing arguments to avoid efforts to obtain a conviction by going

beyond the evidence which is before the jury.'" (Citations omitted.) *State v. Richmond*, 2d Dist. Greene No. 2005 CA 105, 2006-Ohio-4518, ¶ 15, quoting *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984).

**{¶ 61}** In addition, prosecutors may not make statements that are "so inflammatory as to render the jury's decision a product solely of passion and prejudice against the appellant." *State v. Williams*, 23 Ohio St.3d 16, 20, 490 N.E.2d 906 (1986). "Where it appears that prosecutorial comments constituted an invitation to the jury to go beyond the evidence or were so flagrant as to incite the passions or prejudice of the jury, and thereby deny the accused a fair trial, prejudicial error may inhere." *State v. Slagle*, 8th Dist. Cuyahoga No. 55759, 1990 WL 82138, * 9 (June 14, 1990), citing *State v. Price*, 60 Ohio St.2d 136, 140, 398 N.E.2d 772 (1979).

**{¶ 62}** Renner argues that the prosecutor improperly commented that "you hear about it all the time. Domestic violence victims going back to their abusers." That statement was immediately followed by the prosecutor stating, "Remember what the social worker, Sabrina Herman, told you? She said it's not unusual at all for the person abused to go back to the person who abused them. It's not usual. It's common. * * *." Although the phrase "you hear about it all the time" may be interpreted as asking the jury to consider possible community beliefs that were (1) not relevant and (2) not admitted into evidence, the State's comment more so tracked the testimony of the social worker. It was not improper.

**{¶ 63}** Renner next asserts that the State engaged in a "campaign of the use of the word 'we'" to express the prosecutor's personal beliefs and to convey to the jury that the State and the jury should be working as a team. In response, the State acknowledges that

the prosecutor often used the term "we" in her closing argument, but it contests that this was done for a "nefarious" purpose or had an improper effect on the jury. The prosecutor stated, for example, "we all know that this offense happened on January 19, 2012" and "how do we know" that Renner attempted to cause serious physical harm. Upon our review of the prosecutor's closing argument, we find nothing prejudicial in the State's use of the term "we" in the context of this argument.

{¶ 64} Renner further asserts that the prosecutor improperly stated during the State's rebuttal closing argument:

> * * * We, as Prosecutors, don't pick our victims. We don't pick our witnesses. And we don't pick our defendants. *But I will tell you every victim has a right. And she has [sic] a victim and whether she wants to fight for her rights or not, we will and we will. And that's what we're doing.* And believe me, she doesn't want it. She has made it very clear she doesn't want to be here. She doesn't want any part of this and nor does her family. But we are standing up for her rights because she will not do it for herself period.
>
> * * *
>
> Angela Renner is in a very difficult position. *And it's going to be – it may be easy for you when you go back and deliberate, to say, "Well, you know what? If she doesn't care, why should I? If she doesn't care about getting beat up by her own husband, then she deserves it. And I'm going to wash my hands with this case and walk out that door." And you'll be done*

*real quick.*

*You can put not guilty on every one of those verdict forms if that's what you believe. But to do that, ladies and gentlemen, would give him a free pass at beating her.* And that's what he did. That is exactly what happened that night. All of the facts support it. Her reaction to this supports it * * *.

*But it's time to stop the physical abuse and it's time to make sure he is held accountable for what he did to her. * * *.*

(Emphasis added.)

{¶ 65} Renner asserts that the prosecutor's statements, in effect, "turned [the prosecutor] into a superhero – one who fights for the rights of unwilling victims." Renner argues that the prosecutor asked that jury to ignore the evidence and concern themselves with Angela Renner's future situation. In our view, the prosecutor asked the jury to disregard the fact that Angela did not want the State to pursue charges against her husband and, instead, to convict Renner based on the evidence against him. We find nothing improper in the State's argument. And while the phrase "believe me" may improperly personally vouch for certain facts, there was no objection and any error was harmless.

{¶ 66} Renner's sixth assignment of error is overruled.

### VI. Trial Court's Striking of a Portion of the Record

{¶ 67} Renner's seventh assignment of error states:

THE TRIAL COURT ERRED IN IMPROPERLY STRIKING PORTIONS OF THE RECORD.

{¶ 68} In his seventh assignment of error, Renner claims that the trial court erred in striking a portion of the record. The relevant exchange occurred during the State's questioning of Angela Renner, as follows:

[PROSECUTOR]: * * * So you flagged this police officer down and you stop him and you never, ever once tell him what you've just told us today for the very first time that we're hearing this, correct?

[ANGELA RENNER]: Correct.

[PROSECUTOR]: We've never heard this version of events before until today, have we?

[ANGELA RENNER]: I tried to give you this version of events. I tried to tell you what really happened, ma'am, you hung up on me on the phone.

[PROSECUTOR]: I'll ask her to strike that from the record. That's not true.

[THE COURT]: Last comment stricken from the record.

{¶ 69} Renner argues both that the prosecutor's retort and the trial court's striking of Angela's answer were improper. We agree. While we understand that the prosecutor likely reacted in the heat of the moment, a prosecutor cannot become a witness or comment on the veracity of a witness's testimony. In addition, there was nothing improper about Angela's response to the State's question, other than the fact that the prosecutor disagreed with her answer. Accordingly, the trial court had no basis to strike Angela's response from the record.

{¶ 70} We nevertheless cannot conclude that Renner was denied a fair trial due to the prosecutor's remark and the court's striking of Angela's answer. At a later point in the

State's examination of Angela Renner, the prosecutor asked Angela whether she had told Officer Bell, the hospital personnel, or Detective Ring the story that Angela had told in court. Angela responded that she had not. When then asked whether this was the first time "we're hearing that," Angela responded, "I did call you and try to tell you though." During cross-examination by defense counsel, Angela testified:

> [DEFENSE COUNSEL]: Now, you've stated several times that you tried to – now, you said you avoided Detective Ring, so I assume you didn't return his phone calls?
>
> [ANGELA RENNER]: Correct.
>
> [DEFENSE COUNSEL]: And then you tried to contact the prosecutor's office after that?
>
> [ANGELA RENNER]: Correct.
>
> [DEFENSE COUNSEL]: Okay. And why were you trying to contact them?
>
> [ANGELA RENNER]: To tell them that – to tell them what happened.
>
> [DEFENSE COUNSEL]: Did you ever get to tell that to anybody?
>
> [ANGELA RENNER]: No, sir.
>
> [DEFENSE COUNSEL]: Who did you try and call because you said her or pointed to Ms. Montgomery [prosecutor], do you know if you were calling Ms. Montgomery?
>
> [ANGELA RENNER]: I called Mr. Amos' [prosecutor's] number and left a message; when they returned my call, it was Ms. Montgomery on the phone. And this was in June, after [Renner] was arrested.

[DEFENSE COUNSEL]: So, you knew Mr. Amos had the case and you also were given the name of Mrs. Montgomery?

[ANGELA RENNER]: Yes, sir.

[DEFENSE COUNSEL]: You tried to contact both of them?

[ANGELA RENNER]: Yes, I did.

**{¶ 71}** Based on additional questioning by both the State and defense counsel, the jury properly had before it Angela's testimony that she had attempted to contact the prosecutors to tell them a version of events that differed from what she had said on January 19, 2012. Considering the trial as a whole, we cannot conclude that the trial court's striking of Angela's initial response to the prosecutor's question constituted reversible error.

**{¶ 72}** Renner's seventh assignment of error is overruled.

### VII. Ineffective Assistance of Counsel

**{¶ 73}** Renner's eighth assignment of error states:

APPELLANT'S TRIAL COUNSEL WAS INEFFECTIVE.

**{¶ 74}** We review alleged instances of ineffective assistance of trial counsel under the two prong analysis set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted by the Supreme Court of Ohio in *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). Pursuant to those cases, trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland* at 688. To reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that his or her errors were serious enough to create a reasonable

probability that, but for the errors, the result of the trial would have been different. *Id.*

**{¶ 75}** First, Renner argues that the prosecutor asked Officer Nick Bell several questions "concerning medical issues, i.e. the difference between a rash and hives, as opposed to a bruise or an abrasion." Renner further asserts that the prosecutor improperly asked Bell to identify Angela Renner's alleged injuries as "defensive marks" as opposed to "offensive marks." Renner claims that Officer Bell was not medically qualified to render these opinions, and his trial counsel rendered ineffective assistance by failing to object to these questions.

**{¶ 76}** Officer Bell testified that he was present when Officer Aiken photographed Angela Renner at the hospital. The prosecutor reviewed those photographs with Officer Bell, and the officer explained what injury each photograph was intended to capture. During his testimony, Officer Bell stated that he knew the difference between "a rash and an abrasion" and between "dirt and a bruise" and that he knew what stretch marks are. The officer also stated that officers look at people's hands for indications that the person was "throwing strikes." The officer testified that defensive wounds usually appear on the palms or inside of the hand. When reviewing the photographs that were taken of Angela the next day, Officer Bell stated that he had received training regarding defensive wounds, and that the bruising on Angela's arm appeared to be defensive marks.

**{¶ 77}** Evid.R. 701 states: "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Officer

Bell was testifying as a lay witness, but his testimony was based on his personal observation of Angela, his experience and training as a police officer, and a common understanding of how bruises, abrasions, and rashes appear. *See State v. Primeau*, 8th Dist. Cuyahoga No. 97901, 2012-Ohio-5172, ¶ 73-75. We find no error in the admissibility of Bell's testimony. Accordingly, trial counsel did not render ineffective assistance by failing to object to it.

**{¶ 78}** Second, Renner argues that Pamela Kraft, the emergency room nurse who treated Angela at Sycamore Hospital, testified as to statements made by Angela about what had happened to Angela and that those statements did not qualify under Evid.R. 803(4) as statements made for purposes of medical diagnosis or treatment.

**{¶ 79}** Evid.R. 803(4) excludes from the hearsay rule "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." Evid.R. 803(4). "Such statements are deemed to be trustworthy and admissible because 'the effectiveness of the treatment depends upon the accuracy of information given to the physician [so] the declarant is motivated to tell the truth.'" *State v. Hazel*, 2d Dist. Clark No. 2011 CA 16, 2012-Ohio-835, ¶ 45, quoting *State v. Brewer*, 6th Dist. Erie No. E-01-053, 2003-Ohio-3423, ¶ 28.

**{¶ 80}** Renner asserts that his counsel should have objected to Kraft's testimony that, when Angela arrived at the hospital, the paramedic reported that Angela had been assaulted by her husband with a baseball bat and had sustained significant injuries. Even assuming, arguendo, that this testimony by Kraft was objectionable, Jack Ikerd, the

paramedic who evaluated Angela and transported her to Sycamore Hospital, had previously testified that Angela had told him that she was struck by her husband with a baseball bat. Any error in defense counsel's failure to object to Kraft's statement was harmless.

{¶ 81} Renner also claims that his counsel should have objected when Kraft provided a narrative of what Angela said had happened at her home. According to Kraft, Angela had stated that she returned home from work and all the lights were out. The next thing Angela knew, her husband was hitting her with a bat and there was glass everywhere. At some point, Angela was able to get away from him. Renner asserts that some of these statements were hearsay statements that did not fall within Evid.R. 803(4). Renner acknowledges that the facts that Angela was assaulted with a bat and that there was glass were arguably pertinent to medical treatment.

{¶ 82} As Renner recognizes, Angela's statements to Kraft that she was beaten with a baseball bat and that the floor was covered in glass were admissible under the hearsay exception regarding statements for purposes of medical treatment. We agree with Renner that Evid.R. 803(4) did not authorize Kraft to provide such details as that Angela had just returned home from work and that the lights were out, and it is arguable that the identity of her assailant was irrelevant for purposes of medical treatment. However, we find that these statements, even if they were objectionable, constituted harmless error. Angela herself testified that an altercation occurred with her husband after she returned home from work and that there was broken glass on the floor. The issue Angela raised at trial was whether Renner or Angela was the aggressor. Angela's statement that she had been beaten with a baseball bat by Renner – the key fact for that issue – was admissible under Evid.R. 803(4).

**{¶ 83}** Third, Renner asserts that his counsel should have objected to hearsay statements by a social worker because they also were not pertinent to medical diagnosis. Sabrina Herman, a Kettering Health Network emergency room social worker, testified that she was asked to speak to Angela Renner regarding an alleged domestic violence situation. Herman testified about the "cycle of violence" and that she met with Angela "in the capacity that she was a domestic violence victim." Herman stated that she interviews the patient alone and relays that information to the doctor and nurses to make sure all of the patient's injuries are investigated. Herman testified, in great detail, about what Angela stated had happened to her that night, beginning with Angela's argument with her husband while at work and ending with Angela's hiding under a vehicle in the street. Herman described Angela's demeanor during the interview and the information she (Herman) provided Angela regarding domestic violence services in the area.

**{¶ 84}** The State asserts that Herman did not testify regarding the "cycle of violence." However, when asked by the prosecutor whether it was unusual for a domestic violence victim to go back to his/her abuser, Herman stated that it was "very common." The prosecutor followed, without objection, with:

Q: Any why is that?

A: Often times, it's out of fear. It's also because that's, most of the time, the only thing that they know. They're often children of domestic violence situations. They grow up in that kind of situation, and that's really the only thing that they know.

Q: So you, as a social worker, then come in. And why do you want to help

out these particular types of victims in this cycle of violence?

A: Well, we want to break the cycle. We want to let them know that this is not something that's normal, that they can certainly get help for that.

{¶ 85} There was nothing improper about the prosecutor's general questions regarding the cycle of violence. "'Generally, battered woman syndrome testimony is relevant and helpful when needed to explain a complainant's actions, such as prolonged endurance of physical abuse accompanied by attempts at hiding or minimizing the abuse, delays in reporting the abuse, or recanting allegations of abuse.' Such seemingly inconsistent actions are relevant to a witness's credibility." *State v. Haines*, 112 Ohio St.3d 393, 2006-Ohio-6711, 860 N.E.2d 91, ¶ 44, quoting *People v. Christel*, 449 Mich. 578, 580, 537 N.W.2d 194 (1995). *See State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239. Accordingly, defense counsel was not ineffective for failing to object to this portion of Herman's testimony.

{¶ 86} The prosecutor further asked Herman:

Q: Did you, in fact, then meet with Angela Renner at the hospital?

A: I did.

Q: And did you meet with her in the capacity that she was a domestic violence victim?

A: Yes.

* * * [Herman relates what Angela told her about what happened that night.]

Q. All right. Now would it have been prudent, based on what she told you, to allow her to leave with William Renner, her husband?

A: I would not have recommended that, no.

**{¶ 87}** The Ohio Supreme Court has stated that

[a]n expert witness who diagnoses a victim as a battered woman essentially concludes that the defendant is a batterer. In a case where the underlying charges involve domestic violence, such a conclusion by an expert witness is prejudicial to the defendant and usurps the jury's role as finder-of-fact. A diagnosis can prejudice a defendant further because the expert is presenting a conclusion regarding the victim's credibility, which again is a conclusion to be made by the jury.

*Haines* at ¶ 55. "Limitations placed upon the expert's testimony – 'the expert cannot opine that complainant was a battered woman, may not testify that defendant was a batterer or that he is guilty of the crime, and cannot comment on whether complainant was being truthful' – dispel concerns about unfair prejudice." (Citation omitted.) *Id*. at ¶ 56. Herman's conclusion that Angela should not be allowed to leave with Renner all but stated her conclusion that Renner had beaten Angela and would do it again.

**{¶ 88}** However, an expert's stated opinion indicating that a person is a victim of domestic violence is not necessarily reversible error. In *Haines*, the supreme court found that an expert's opinion tying the victim to "battered women's syndrome" was harmless error with respect to an incident that was timely reported, where the jury was presented with photographs of the victim's injuries and heard testimony from the victim's co-workers and police officers who had responded to the scene. *Id*. at ¶ 64. Here, Angela approached a police officer shortly after the alleged incident. The jury heard statements that Angela made

to that officer, the paramedic, the emergency room nurse, and the investigating detective, and the State presented photographs of Angela's injuries and the disarray in the house. Although we consider it a close question, we conclude that Herman's testimony regarding her speaking to Angela as a domestic violence victim was harmless beyond a reasonable doubt.

{¶ 89} Renner argues that Herman's testimony should not fall within Evid.R. 803(4) because she was the fourth person (after the paramedic, emergency room nurse, and doctor) to consult with Angela. Renner states that Herman's role was to investigate "any missed evidence" from Angela, not to assist with her medical conditions. The fact that Angela had relayed what had occurred to other medical personal prior to speaking with Herman does not negate the fact that Herman spoke with Angela, at least in part, to obtain information to share with the doctors and nurses to ensure that all of Angela's physical injuries were addressed. The reason for applying the hearsay exception for statements made for the purpose of medical diagnosis and treatment is no less applicable to Herman than it was to the other medical providers.

{¶ 90} Renner further complains that Herman's narrative of what Angela had told her regarding the incident went well beyond what was needed for medical treatment and diagnosis. Herman testified:

> [Angela] told me that she was at work and that she was supposed to order a pizza from Denado's (phonetic). And she had ordered it wrong. And she had continued to fight with her husband – excuse me – Mr. Renner throughout the evening via text message. And when she got home – excuse.

I'm sorry. He had, at one point, turned her phone off. She told me that he had turned her phone off.

And when she went home, the house was dark. She did not have her keys. And so, she went in through the basement door, but the door to the inside of the home was locked. So she had to sit on the steps waiting for Mr. Renner to return home. At that point, when he did, she called to him to say unlock the door, please. And at that point, the fight ensued.

* * * [Angela said that, when he opened the door,] he had punched her, had pulled her hair, threatened to kill her, at one point got a baseball bat and attempted to swing it at her. She said she had put her feet up to block the baseball bat. After that, she said it pretty much just happened so fast that she couldn't remember everything.

When he had gone to the kitchen for whatever reason, she had run out of the house, had gone down several houses to try to find one with a light on to get assistance. And when she couldn't find any, she hid underneath the vehicle in the street.

{¶ 91} Angela's statement to Herman about what occurred after Renner opened the door was related to the potential injuries that Angela may have suffered, and thus it fell within Evid.R. 803(4). However, we agree with Renner that Herman's description of what happened to Angela prior to and after the fight was unnecessary for medical diagnosis and treatment.

{¶ 92} The State asserts that all of Angela's statements to Herman were admissible

for impeachment as a prior inconsistent statement under Evid.R. 613(B). We disagree. Angela was not asked by the State about the specific statements she made to Herman. She was merely asked if she had told "the doctors and nurses" at Sycamore Hospital that Renner had assaulted her, and Angela responded that she had because the police officers were there. Herman and Angela were alone when they spoke. Accordingly, the State did not afford Angela an opportunity to explain or deny her statement to Herman, as required by Evid.R. 613(B)(1), prior to introducing Herman's testimony.

{¶ 93} Nevertheless, before Herman testified, Angela had testified that she had gotten upset with her husband at work (although she did not mention pizza), that some angry text messages had gone back and forth between them, and that he had turned off her phone. Officer Bell had also testified that Angela had stated (as an excited utterance) that she was locked out of the house and had to wait on the basement steps until her husband came home. Bell testified that Angela reported that Renner came home, dragged her inside the house, and "just went ballistic." We therefore conclude that Herman's testimony about what happened to Angela was cumulative of the evidence already before the jury, and its admission was harmless.

{¶ 94} Fourth, Renner claims that his counsel was ineffective in failing to request limiting instructions that the State's impeachment evidence could not be considered for its truth but, instead, should be considered only in evaluating Angela's credibility. The record substantiates that, during the State's case-in-chief, defense counsel did not request any limiting instructions relating to the use of Angela's prior inconsistent statements, and that the trial court was not requested to and did not instruct the jury regarding the use of

impeachment evidence in its jury instructions.

{¶ 95} Renner's failure to request a limiting instruction arguably falls within the realm of trial tactics. *See State v. Risden*, 2d Dist. Montgomery No. 22930, 2010-Ohio-991, ¶ 179. In addition, much of the information that came in as impeachment testimony also was admissible as substantive evidence. The cruiser recording of Angela's statements and the statements that she made to medical personnel about being beaten by Renner were all admissible as substantive evidence of Renner's guilt under exceptions to the hearsay rule. Accordingly, we cannot conclude that Renner was unfairly prejudiced by his counsel's failure to request limiting instructions.

{¶ 96} Fifth, Renner claims that his trial counsel should have objected to the court's calling Angela Renner as a court witness. Counsel did object to the State's request that Angela be called as a court witness. Regardless, as discussed above, we find no error in the trial court's decision.

{¶ 97} Sixth, Renner asserts that his attorney should have objected to the procedure the State used to play the cruiser video. We concluded, above, that the cruiser video was admissible as an excited utterance. Accordingly, we cannot conclude that Renner was prejudiced by the manner in which the State introduced the video.

{¶ 98} Seventh, Renner claims that his trial counsel was ineffective for not objecting to any portion of the State's "campaign of misconduct," which was discussed in his sixth assignment of error. We concluded, above, that the alleged instances of prosecutorial misconduct were not unfairly prejudicial. Accordingly, we cannot find that Renner's counsel rendered ineffective assistance by failing to object.

{¶ 99} Eighth, Renner claims that his attorney should have objected to the trial court's striking of the portion of the record discussed in his seventh assignment of error. We agree with Renner that his counsel should have objected. Nevertheless, we concluded that Renner was not denied a fair trial due to the prosecutor's remark and the court's striking of Angela's answer. Accordingly, we cannot conclude that counsel rendered ineffective assistance when he failed to object to the prosecutor's statement and the court's action.

{¶ 100} Finally, Renner states that his trial counsel rendered ineffective assistance during voir dire when he stated, "The victim in this case is the Defendant's wife." Renner asserts that his attorney should have referred to her as the "alleged victim" and his failure to do so was prejudicial. Renner has cited a single instance where his attorney referred to Angela as "the victim." Viewing the trial as a whole, we cannot conclude that this single remark was prejudicial.

{¶ 101} Renner's eighth assignment of error is overruled.

### VIII. Conclusion

{¶ 102} The trial court's judgment will be affirmed.

. . . . . . . . . .

FAIN, P.J., concurs.

DONOVAN, J., concurring:

{¶ 103} I write separately to discuss the seventh assignment of error. The majority notes that the prosecutor likely reacted in the "heat of the moment" when she commented upon Angela's testimony, characterizing it as "not true." This misconduct was

exacerbated by a request to strike (a responsive answer) which was then granted by the trial court erroneously. The trial court should have declined to make a credibility determination between the prosecutor and the uncooperative complaining witness, Angela. The court's ruling created the appearance, even if it did not reflect the reality, of favoring the cause of the State and gave testimonial credit to the prosecutor's editorial comment that Angela's testimony was "not true."

{¶ 104} Furthermore, the conduct of the prosecutor appears to constitute a violation of Rule 3.4 of Ohio Rules of Professional Conduct which state in pertinent part:

A lawyer shall not do any of the following:

(e) in trial . . . assert personal knowledge of facts in issue

except when testifying as a witness, or state a personal opinion

as to . . . the credibility of a witness.

{¶ 105} I am disinclined to write this off as "heat of the moment." The comment was made by a prosecutor with several years of experience; accordingly she should not have asserted personal knowledge of the facts. The trial court, as gatekeeper, should not have contributed to potential jury confusion regarding the role of an advocate versus that of a witness. Trial judges would be wise to react swiftly and definitively to prevent such conduct from reoccurrence and thus educate attorneys as to their ethical obligations.

. . . . . . . . . .

Copies mailed to:

Andrew T. French
Brent E. Rambo
Hon. Barbara P. Gorman