[Cite as *State v. Johnson*, 2015-Ohio-5491.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

STATE OF OHIO                                    :
                                                 :    Appellate Case No. 26055
      Plaintiff-Appellee                   :
                                                 :
v.                                               :    Trial Court Case No. 10-CR-4099/4
                                                 :
BILLY JACK JOHNSON, JR.                          :
                                                 :    (Criminal Appeal from
      Defendant-Appellant                  :     Common Pleas Court)
                                                 :

. . . . . . . . . . .

# O P I N I O N

Rendered on the    30th    day of     December    , 2015.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by CARLEY J. INGRAM, Atty. Reg. #0020084, Montgomery County Prosecutor's Office, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
      Attorneys for Plaintiff-Appellee

DAVID R. MILES, Atty. Reg. #0013841, 125 West Main Street, Suite 201, Fairborn, Ohio 45324
      Attorney for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, P.J.

{¶ 1} Billy Jack Johnson appeals from his convictions for aiding and abetting the crimes of felony murder, aggravated burglary, and aggravated robbery. The State of Ohio cross-appeals from the trial court's judgment insofar as it merged the counts of aggravated burglary and aggravated robbery for sentencing purposes.

{¶ 2} The trial court did not err in overruling Johnson's motion to suppress evidence, and the judgment was supported by sufficient evidence. We find, however, that the trial court erred in allowing the State to present extensive, substantive evidence of certain witnesses' prior statements incriminating Johnson and that this error was not harmless. Accordingly, the judgment will be reversed, and the matter will be remanded for further proceedings consistent with the opinion. As a result of this disposition, Johnson's other assignments of error and the State's cross-assignment of error are moot.

## I. FACTS

{¶ 3} As a preliminary matter, we clarify the references to the record that will appear throughout this Opinion. The trial transcript consists of five volumes numbered I through V (all of which list the dates December 10, 11, 12, 13, and 16, 2013 and January 13, 2014) and an unnumbered volume designated "Jury Trial and Verdict," which lists the date of December 18, 2013. Volume I begins at page 1 and has pages numbered 1-257. The remainder of the volumes referenced by Roman numeral have page numbers beginning where the previous volume left off. The volume labeled "Jury Trial and Verdict" has pages numbered 1-268. For purposes of citing to the transcript, we will refer to the sixth volume as "Jury Trial and Verdict," and to the five numbered volumes as "Trial Tr."

{¶ 4} On the evening of December 9, 2010, four people were home at 4813 Hagen Avenue in Jefferson Township: Mercedes D., her partner, Patrick Hall, and Ms. D.'s two children. One of the children, nine-year-old D.J.,[1] was watching television in a "back living room"; Mercedes D. and Hall were in their bedroom.

---

[1] We use the initials of the child to protect his identity.

{¶ 5}   At approximately 9:00 p.m., four men kicked in the front door of the house and entered.   At least two of the men were armed, and some wore masks.   The men grabbed D.J., put a gun to his head, began yelling for Hall, and threatened to "shoot the boy" if Hall did not give them "the money."   The intruders pulled D.J. down the hall to the door of the master bedroom, kicked in the bedroom door, and threw D.J. on the bed.   Hall fled to the master bathroom and locked the door.   At the same time, one of the intruders grabbed Mercedes D. by the hair and led her to another room to disable a security alarm, which she had activated from the bedroom using her key fob.   The men continued to demand money from Hall, who stated that he did not have any money.   The intruders kicked and opened the bathroom door, shot Hall two times, and then fled from the house. Hall died a short time later.

{¶ 6} Evidence about the shooting was developed through investigations by the Montgomery County Sheriff's Department and the FBI Safe Streets Task Force. Detective Brad Daugherty of the Montgomery County Sheriff's Department testified that the following suspects emerged: Roderick Montgomery (also known as Trayvone), Demond Johnigan, Trammel Garrett, Trammel's brother Devon Garrett, Larry Crowder, and Billy Jack Johnson.   Crowder and Johnson were believed to have waited in the getaway vehicle.   Det. Daugherty compiled photo arrays containing some of the suspects.   D.J. identified Montgomery and Johnigan as two of the men who had been involved in the shooting; he identified Johnigan as Hall's shooter.   Mercedes D. also identified Montgomery, stating that he was the man who took her down the hall to turn off the alarm.

{¶ 7}   Based on the identifications, interviews by Det. Daugherty with Trammel

Garrett[2] and Johnigan, and other evidence, the State developed the following theory of the case: Montgomery, Johnigan, Garrett, and Garrett's brother had been the men who broke into the house at 4813 Hagen on December 9, 2010. Crowder had driven the van that took the men from a house on Oakridge, where the robbery was planned, to Hagen Avenue, and Johnson had been a passenger in the van. Johnson had identified Hall as the target of the robbery, and the men had scoped out the house before they entered. Johnson had not participated in the home invasion himself because he claimed to have had a bad leg; he and Crowder acted as look-outs and had a walkie-talkie to alert the men who entered the house if the police arrived. Johnson and Crowder parked the van at an abandoned house a short distance from the Hagen house during the home invasion.

{¶ 8} Johnson was interviewed in late December 2010 and early January 2011 by Timothy Bilinski, a Dayton police officer, and Timothy Ferguson, an FBI special agent, both of whom were assigned to the FBI's Safe Streets Task Force. According to Bilinski, the FBI was interested in Hall's death because some of the suspects were "involved in other crimes of interest to the federal government." (Trial Tr. 792.)

{¶ 9} During the course of Johnson's interviews, his version of the events of December 9 changed several times. After initially denying that he knew anything about what had happened on Hagen Avenue, Johnson eventually admitted that he had been present at a house on Oakridge while the robbery was planned. He further stated that the six men – including Montgomery, Johnigan, Garrett, Crowder, and Johnson[3] -- had

---

[2] For purposes of this Opinion, we will use the name "Garrett" to refer to Trammel Garrett, whose statements to Det. Daugherty played a large role at trial. The actions of Devon Garrett are of little relevance to our discussions.

[3] Det. Daugherty identified the sixth man as Garrett's brother, but Johnson apparently did not specifically identify the sixth participant during the interview.

gone to the house on Hagen in a van driven by Crowder. Garrett had briefly exited the van to case the house; when he returned, Garrett reported that a television was on and the robbery was "going to be a go." (Trial Tr. 828.) The four men in the back of the van (including Montgomery, Garrett, and Johnigan) then exited the van together and went into the house while Crowder parked at an abandoned house near the top of the street. Johnson and Crowder acted as lookouts and had a walkie-talkie in the van that was "crackling." (Trial Tr. 829.)

{¶ 10} Johnson stated that the four men ran back to the van a short time later. When they got in, Johnson heard something hit the floor, turned around, and saw a semi-automatic handgun at Garrett's feet. One of the men said, "I busted one off" (Trial Tr. 830.), but Johnson was unsure who said it. Johnson further stated that the men had anticipated finding cash and high-grade marijuana known as "Purp" in the house, and that Johnson expected to get some marijuana in exchange for his involvement.

{¶ 11} Garrett, Johnigan, and Montgomery were eventually charged with crimes related to the robbery and murder. Garrett and Johnigan negotiated plea agreements under which they agreed to plead guilty to aggravated murder and other charges and to cooperate with the State, including, if necessary, testifying against the others involved. Montgomery's case was tried to a jury in 2012. At Montgomery's trial, Johnigan testified for the State and gave detailed descriptions about the burglary, robbery, and shooting and Montgomery's participation in the events. Montgomery was found guilty. Garrett, Johnigan, and Montgomery received lengthy prison terms.

{¶ 12} In November 2012, Johnson was indicted on two counts of complicity to commit felony murder in violation of R.C. 2903.02(B), four counts of complicity to commit

aggravated burglary in violation of R.C. 2911.11, and two counts of complicity to commit aggravated robbery in violation of R.C. 2911.01, all of which included firearm specifications; he was also indicted on having weapons while under disability in violation of R.C. 2923.13(A)(2), with a prior offense of violence specification. Johnson moved to suppress the statements that he had made to Det. Bilinski and Agent Ferguson; the trial court overruled this motion.

{¶ 13} At Johnson's trial, the State presented the testimony of numerous people, including Garrett, Johnigan, Det. Bilinski, Agent Ferguson, Det. Daugherty, D.J., and Mercedes D.

{¶ 14} Although both Garrett and Johnigan had previously agreed to testify for the State, they became uncooperative at trial. Before trial on the morning that Garrett was scheduled to testify, the prosecutors reviewed his testimony with him, and Garrett was cooperative. However, when Garrett took the witness stand, he denied knowing Johnson. The trial court permitted prosecutors to treat Garrett as a hostile witness and to impeach him with statements that he had made to Det. Daugherty implicating Johnson. Garrett proceeded to deny every detail of the prior accounts of the crime that he had given to the investigators and to claim that he had never made the statements attributed to him. During defense questioning, Garrett testified that Johnson had nothing to do with the murder, Johnson had stayed back at the house where the group had met that night, and Johnson had not accompanied the men on the robbery. When prosecutors followed up on redirect, Garrett again said that he did not know Johnson.

{¶ 15} Johnigan told prosecutors the day before they planned to call him that he did not intend to testify. On the State's motion, the trial court called Johnigan as a court's

witness. When Johnigan failed to testify consistent with his prior statements and his prior testimony, prosecutors sought to impeach him with the sworn testimony he gave at Montgomery's trial. Johnigan consistently denied the truth of his prior testimony and even asserted that the transcription of his prior testimony was "a lie." (Trial Tr. 559, 561, 562).

{¶ 16} After Garrett and Johnigan testified, Det. Daugherty testified about his investigation and his interviews with Garrett and Johnigan. Daugherty testified at length and in detail about Garrett's statements describing the planning and commission of the home invasion. He testified in less detail about Johnigan's prior statements and testimony. In both instances, the defense objected, but the trial court allowed the testimony for impeachment purposes.

{¶ 17} Det. Bilinski and Agent Ferguson testified about their interviews with Johnson and Johnson's confession. Johnson did not testify, but the defense did call some other witnesses.

{¶ 18} Before the case went to the jury, the State dismissed three of the counts in the indictment: two counts of complicity to commit aggravated burglary (solicitation) and one count of complicity to commit aggravated robbery (solicitation).

{¶ 19} The jury found Johnson guilty of two counts of complicity to commit felony murder, two counts of aggravated burglary, and one count of aggravated robbery. The jury also found Johnson guilty of the accompanying firearms specifications. The charge of having weapons under a disability was tried to the court, which found him not guilty.

{¶ 20} At sentencing, the trial court merged the two murder convictions and merged all of the firearm specifications. Over the State's objection, the court also

merged the two aggravated burglary convictions into the aggravated robbery conviction. The court sentenced Johnson to 15 years to life for murder, 5 years for aggravated robbery, and 3 years for the firearm specifications, all running consecutively, for a total prison sentence of 23 years to life.

{¶ 21} Johnson appeals, and the State cross-appeals.

## II. ANALYSIS

{¶ 22} Johnson raises eleven assignments of error, and the State raises one assignment.   We begin with Johnson's assignments of error, and we will address them in an order that facilitates our discussion.

## A. Overruling the Motion to Suppress

{¶ 23} Johnson's first assignment of error asserts that the trial court erred by overruling his motion to suppress his statements to Det. Bilinski and Agent Ferguson. His argument briefly references the voluntariness of his statements, but it is largely focused on disputing the trial court's findings of fact and its determinations as to the credibility of the witnesses.   Johnson contends that the trial court should have believed his assertions that, during the December 2010 interview, he had not acknowledged that he understood his rights and had requested an attorney and that, during the January 2011 interview, he also had not understood his rights.

{¶ 24}   "Appellate review of a motion to suppress presents a mixed question of law and fact.   When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses.   Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence.   Accepting these

facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." (Internal citations omitted.) *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8; *see also State v. Greene*, 2d Dist. Montgomery No. 26138, 2015-Ohio-2060, ¶ 19.

**{¶ 25}** Det. Bilinski, Agent Ferguson, Det. Daugherty, and Johnson testified at the hearing on the motion to suppress. Det. Bilinski and Agent Ferguson testified about the circumstances surrounding Johnson's execution of the pre-interview forms, his behavior at the time, and his indications that he understood the forms, and that he did not ask for an attorney. Johnson contradicted some of these assertions. Det. Daugherty testified that he had interviewed Johnson subsequent to Johnson's interviews with Det. Bilinski and Agent Ferguson, that he (Daugherty) had advised Johnson of his rights, and that Johnson had not made any claim at that time that his prior interviews with Det. Bilinski and Agent Ferguson had violated these rights. Based on evidence presented, the trial court found that Johnson was advised of his *Miranda* rights before both interviews, understood those rights, and waived them. The trial court also found that Johnson never asked for an attorney.

**{¶ 26}** Johnson asserts that "[e]ven if *Miranda* has been complied with, the trial court must consider voluntariness * * *." (Brief of Defendant-Appellant, 5). Johnson is correct that *Miranda* compliance and voluntariness are separate issues. *State v. Dennis*, 79 Ohio St.3d 421, 425, 683 N.E.2d 1096 (1997). "Whether a statement was made voluntarily and whether an accused voluntarily, knowingly, and intelligently waived his right to counsel and right against self-incrimination are distinct issues." *Id.* But the trial

court did consider the voluntariness of Johnson's statements. It concluded: "The Defendant's confession was voluntarily given. Defendant is experienced and is not lacking in intelligence. The Defendant was not promised anything and did not appear to be under the influence of any intoxicating substances. The interrogations, in total, were lengthy, but they did not involve any mistreatment or physical depravation." (Decision and Entry Overruling Defendant's Motion to Suppress, p. 10). These findings are supported by the testimony of Det. Bilinski and Agent Ferguson.

{¶ 27} Johnson also argues that the trial court should not have believed the officers' testimony about the interviews because they failed to comply with R.C. 2933.81(B), which creates a presumption that statements made during a custodial interrogation, by a person suspected of committing certain offenses, were made voluntarily "if the statements made by the person are electronically recorded." However, the statute also provides that a failure to record "shall not provide the basis to exclude or suppress the statement in any criminal proceeding." R.C. 2933.81(C).

{¶ 28} Det. Bilinski testified that the interviews with Johnson were not recorded because Johnson was a target of a federal investigation, and federal investigators are not required to record interviews or statements by suspects. Johnson seems to argue that R.C. 2933.81(B), which facially creates a presumption of voluntariness if a statement is recorded,[4] inferentially creates a presumption of involuntariness if a statement is not recorded. Johnson also argues that the failure to comply with R.C. 2933.81(B) is a factor in determining the credibility of a law enforcement witness, although he cites no legal

---

[4] We have expressed concerns about the constitutionality of shifting the burden of proving voluntariness to a defendant. *See State v. Western*, 2015-Ohio-627, 29 N.E.3d 245, ¶ 17 (2d Dist.).

authority to support this contention.

{¶ 29} Credibility of witnesses is generally determined by "the appearance of each witness upon the stand, his manner of testifying, the reasonableness of the testimony, his accuracy of memory, frankness or lack of it, intelligence, interest and bias, and all the facts and circumstances surrounding the testimony"; the trial court cited these factors in its decision. Moreover, even if the failure to record the interview were a factor in evaluating the credibility of a law enforcement officer, on the facts of this case, the trial court could have reasonably found that the failure to record was outweighed by other factors supporting the officers' credibility. The testimony of Det. Bilinski and Agent Ferguson that Johnson understood his rights, spoke voluntarily, and did not ask for an attorney was competent, credible evidence; the trial court explicitly found that Johnson's claims to the contrary were "not credible."

{¶ 30} The trial court did not abuse its discretion in crediting the testimony of the officers with respect to the circumstances surrounding Johnson's interview.

{¶ 31} The first assignment of error is overruled.

### B. Treating Garrett as Hostile Witness

{¶ 32} In his sixth assignment of error, Johnson alleges that the trial court erred in allowing the State to treat Garrett as a hostile witness and to question Garrett about his prior statements to law enforcement officers. Johnson contends that 1) the State was not surprised or affirmatively damaged by Garrett's testimony, because he had given inconsistent statements to police in the past, 2) the question of whether Garrett would be treated as a hostile witness should have been addressed outside the presence of the jury, and 3) the State's questions elicited hearsay and presented "the substance of its case

through its questioning," rather than through answers to those questions.

{¶ 33} A "hostile witness" is one who surprises the calling party at trial by turning against that party while testifying. *State v. Darkenwald*, 8th Dist. Cuyahoga No. 83440, 2004-Ohio-2693, ¶ 15. A "hostile witness" is addressed under Evid.R. 607, which states that the "credibility of a witness may be attacked by any party except that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage." For purposes of the rule, a party demonstrates surprise when a witness's trial testimony is "materially inconsistent" with a prior statement and counsel did not have reason to believe that the witness would repudiate the prior statement. *State v. Travis,* 165 Ohio App.3d 626, 2006-Ohio-787, 847 N.E.2d 1237 (2d Dist.); *State v. Eicholtz*, 2d Dist. Clark No. 2012 CA 7, 2013-Ohio-302, ¶ 38. "Affirmative damage" exists when a witness's trial testimony contradicts, denies, or harms the case of the party who called that witness; it does not exist when a witness denies knowledge or fails to remember. *Eicholtz* at ¶ 38, citing *Dayton v. Combs,* 94 Ohio App.3d 291, 299, 640 N.E.2d 863 (2d Dist.1993); *State v. Risden*, 2d Dist. Montgomery No. 22930, 2010-Ohio-991, ¶ 74.

{¶ 34} "When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions." Evid.R. 611(C). "A leading question is 'one that suggests to the witness the answer desired by the examiner.' " *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 149, citing 1 McCormick, Evidence (5th Ed.1999) 19, Section 6. This rule gives the court discretion to allow counsel to proceed with leading questions so that, in effect, the direct examination becomes a cross-examination by leading questions. *Darkenwald* at ¶ 14.

{¶ 35} The decision as to whether a witness is a "hostile" witness, which includes whether the elements of surprise and affirmative damage have been established, is entrusted to the broad, sound discretion of the trial court. *State v. Diehl*, 67 Ohio St.2d 389, 391, 423 N.E.2d 1112 (1981).

{¶ 36} Two weeks after Hall's murder, Garrett gave a recorded statement to Det. Daugherty that implicated Johnson. Almost a year later, on December 3, 2011, during discussions about a possible plea deal concerning his own charges, Garrett gave Det. Daugherty additional information about the crimes. In August 2012 (before Johnson's trial began), Garrett pled guilty to aggravated murder, aggravated robbery, aggravated burglary, two counts of kidnapping, and several firearm specifications in exchange for an aggregate prison term of life imprisonment with parole eligibility at 30 years. As part of the plea agreement, Garrett further agreed to "testify truthfully and provide full and complete information to law enforcement and assistant prosecuting attorneys at all times, whether under oath or not, concerning matters to which he has knowledge that relate to the events * * * leading up to and surrounding the death of Patrick Hall and related to the investigation and/or trial of any potential co-defendants."

{¶ 37} The agreement further provided that, if Garrett did not "testify truthfully" and provide complete, accurate information, then 1) his plea agreement would be "null and void," 2) any claims of double jeopardy would be waived, 3) his case could be reopened, 4) his statements would be admissible in any criminal or civil proceeding brought against him, 5) he would waive any claim that such statements were not admissible against him, and 6) he could face additional charges for perjury and obstruction of justice.

{¶ 38} When Garrett was called to the witness stand at Johnson's trial, the prosecutor asked Garrett about his plea agreement and whether he knew various people connected with the case. Garrett acknowledged that he knew Johnigan, Montgomery, Devon Garrett (his younger brother), and Crowder, but when the prosecutor asked if he knew Johnson, Garrett responded that he did not:

Q: * * * And, how about a person by the name of Billy Jack Johnson? Do you know a person by that name?

A: No.

Q: Excuse me?

A: No.

Q: Do you know him by a different name?

A: No.

Q: Have you ever heard of the name of June [one of Johnson's nicknames]?

A: No.

(Trial Tr. 503.)

{¶ 39} The prosecutor asked for a sidebar conference with the judge. The prosecutor stated that since Garrett's December 23, 2010, interview with Det. Daugherty, "Garrett has always acknowledged his, not only his knowledge of the Defendant, but the Defendant's involvement in this case," and that as recently as the morning of Garrett's testimony he had been "very cooperative." Defense counsel pointed out that, in Garrett's initial statements to police (prior to December 23, 2010), Garrett had denied Johnson's involvement in the robbery, but counsel did not deny that Garrett had always

acknowledged knowing Johnson in prior statements. Although some parts of the discussion are marked "indiscernible" in the transcript, the prosecutor apparently asked for and was granted permission to treat Garrett as a hostile witness. (Trial Tr. 503-505.)

**{¶ 40}** The prosecutor then used leading questions to examine Garrett, often prefaced with "Isn't it true that * * *." Many of these questions asked whether Garrett had told law enforcement officers particular things about the planning and commission of the home invasion. Garrett repeatedly answered "No." At one point, the prosecutor asked whether Garrett feared someone in the courtroom.

Q: Did you see anybody come in this courtroom that causes you any concern?

A: No.

Q: Is that why you're changing your testimony right now?

A: No.

Q: You sure about that?

A: Yeah. No, I just I don't feel like going through this.

(Trial Tr. 511.)

**{¶ 41}** After several more leading questions about the events preceding the home invasion, the prosecutor asked Garrett numerous pointed questions about what he had said to Det. Daugherty in December 2010. For instance, the prosecutor asked Garrett, "And isn't it true that you told the detective that Billy Jack Johnson was the person who directed Larry Crowder on how to drive—where to drive the vehicle to?" (*Id.* at 515). The prosecutor also asked "isn't it true that" Garrett saw Johnson around Thanksgiving 2010, at which time Johnson told Garrett to "stay in touch because he [Johnson] might have a

lick to hit" (a phrase understood by the detective to refer to a robbery). (Trial Tr. 507-508.) Garrett was asked "isn't it true" that he told the detective about getting a phone call from Johnson on December 9, 2010, about having a lick to hit. (Trial Tr. 509-510.) The prosecutor inquired whether Garrett had previously stated to Det. Daugherty that he (Garrett) had brought a gun to the meeting point on Oakridge and whether Garrett had displayed a Mossberg shotgun at that time. (Trial Tr. 512.) Garrett denied having told Det. Daugherty anything.

{¶ 42} Other times, the prosecutor asked Garrett whether a fact was true, and when Garrett denied it, the prosecutor asked if that is what he had told law enforcement officers. For example:

Q:    And then once at that location [the vacant house where the van waited] there was a discussion inside the van, and Billy Jack Johnson said he couldn't go because he had hurt his leg so he couldn't go to do the home invasion, but he would stay there and be a lookout and let everyone know if the police came --

A:    No.

Q:    – isn't that true?

A:    No.

Q:    Isn't that true? And isn't that what you told the detective?

A:    No.

* * *

Q:    And, in fact, isn't it true that night you told – when you were having discussions about doing the lick * * * that Billy Jack Johnson told the group

that he had three licks that he was thinking about hitting that night? He wasn't sure which one to hit first, but he decided on the house in Jefferson Township; isn't that true?

A:    No.

* * *

Q:    And it's it [sic] true that at that time you -- that Demond Johnigan fired off a round and shot, and you saw him shoot Patrick Hall in his leg while he was standing there in the bathroom?

A:    No.

Q:    Isn't that what you told the detective?

A:    No.

Q:    And isn't it true that you told the detective that Patrick Hall fell onto the floor there in that area between the bathroom and the entry where [sic] to the bathroom, and he was saying, "I'll give you anything -- just you don't have to shoot?"

A:    No.

Q:    Isn't that what you told the detective?

A:    No.

Q:    Or words to that effect?

A:    No.

Q:    And isn't it true that at that time as Patrick Hall was there essentially begging [you] not to shoot anymore, that he'll give you whatever you want, that Demond Johnigan fired a second shot into Patrick Hall and striking him,

and Patrick Hall then fell completely onto the floor there in the bathroom area?

A:     No.

Q:     Isn't that what you told the detective?

A:     No.

(Trial Tr. at 519, 520, 523-524.)

{¶ 43}   The prosecutor asked various forms of leading questions more than 80 times, to which Garrett answered "No."   Garrett was also asked whether he recognized several photos of the home where the crimes occurred, and he said "No."   He did identify a rights form that he had signed, and he admitted that he had talked to Det. Daugherty about the involvement of himself and others in the home invasion, but he specifically denied any involvement by Billy Jack Johnson.

{¶ 44}   At several points, defense counsel made hearsay objections, but the trial court overruled them, saying that the questioning was permitted for impeachment purposes.

{¶ 45}   Johnson argues both that Garrett should not have been treated as a hostile witness and that, even if he were properly treated as a hostile witness, the State's questions were so extensive and detailed that they exceeded the scope of reasonable impeachment and amounted to the presentation of substantive evidence.   Johnson also contends that the trial court should have held a hearing to determine if Garrett was a hostile witness.

{¶ 46}   Johnson does not cite any legal authority for his contention that a trial court must hold a hearing to determine if a witness is hostile.   The court might have questioned

Garrett out of the jury's presence, but it was not required to do so, and Johnson never asked for an in camera hearing. The trial court's handling of the State's request to treat Garrett as a hostile witness was not an abuse of discretion.

{¶ 47} Moreover, Garrett was plainly "hostile" to the prosecutor; he refused to acknowledge facts which were central to his plea and his plea bargain, including his relationship with Johnson and Johnson's participation in and planning of the robbery. During opening statement, the State had indicated that Garrett would testify that Johnson provided information about the victim of the robbery, helped plan the robbery, and was a lookout in the van that transported Garrett and the others. (Trial Tr. 285-286.) On the morning of the day that Garrett was called to testify, the prosecutors met with him, and he gave no hint that he did not intend to honor his plea agreement. Even defense counsel characterized Garrett as a hostile witness and acknowledged the surprise. (Trial Tr. 541.) Garrett's testimony that he did not know Johnson and that Johnson was not involved in any way in the home invasion plainly contradicted the State's theory of the case, as laid out to the jury in opening statements. The trial court did not abuse its discretion in declaring Garrett a hostile witness.

{¶ 48} Johnson's last argument regarding Garrett's questioning is that the trial court effectively allowed the State to use Garrett's prior inconsistent statements as substantive evidence. We find this issue to be much more problematic.

{¶ 49} A party that calls a witness who is deemed "hostile" is permitted to ask leading questions and, upon a showing of surprise and affirmative damage, is also permitted to impeach its own witness with a prior inconsistent statement. Evid.R. 607(A); *State v. Dearmond*, 179 Ohio App.3d 63, 2008-Ohio-5519, 900 N.E.2d 692, ¶ 26

(2d Dist.). "It is the generally accepted view that a prior inconsistent statement is only admissible to impeach the declarant and should not be taken into evidence to prove the truth of the matter asserted. Ohio has long adhered to this general principle." *Dearmond* at ¶ 26.

{¶ 50} When taken by surprise by the adverse testimony of its own witness, a party may interrogate such witness concerning his prior inconsistent statements for the purposes of calling into question the witness's veracity or of refreshing the witness's recollection, but not for the purpose of offering substantive evidence against the accused. *State v. Dick*, 27 Ohio St.2d 162, 165, 271 N.E.2d 797 (1971); *Dearmond* at ¶ 26; *Darkenwald*, 8th Dist. Cuyahoga No. 82440, 2004-Ohio-2693, ¶ 17. "Indeed, to allow prior inconsistent statements to be considered for their truth would 'allow men to be convicted on unsworn testimony of witnesses—a practice which runs counter to the notions of fairness on which our legal system is founded.' " *Dearmond* at ¶ 26, quoting *Bridges v. Wixon,* 326 U.S. 135, 153, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945).

{¶ 51} Because Garrett had been declared a hostile witness, the State was entitled to an opportunity to confront Garrett with his prior statements to challenge the veracity of his trial testimony or in the hope that he would begin to testify truthfully (i.e., consistent with his prior statements). However, in our view, the scope of the State's questioning far exceeded that necessary to show the inconsistency or to call Garrett's credibility into question. The State's leading questions encompassed many details of the offenses, including specific descriptions of what happened inside the house, despite the fact that the State's theory of the case did not place Johnson inside the house. The questions also referenced another robbery of a man sitting in a car that was committed as the men

fled the victim's house, in which Johnson was not implicated.

{¶ 52} The State's questions suggested, among other things, that: 1) Johnson had been the instigator of the robbery and had planned the crime for several weeks; 2) Garrett and Montgomery expressed reservations about Johnigan's involvement in the plan, because "you never know what that guy does, he shoots people," but Johnson vouched for Johnigan, saying "He's my dude, you don't have to worry about him"; 3) Johnson provided the directions to the house on Hagen Avenue; 4) Johnson assured the group that there was a significant amount of cash and marijuana in the house; and 5) Johnson suggested "snatching" a kid, if one was encountered in the house, so that Hall would hand over the money. All of these questions were rooted in Garrett's prior statements to Det. Daugherty.

{¶ 53} Many of the State's questions of Garrett served no legitimate purpose related to impeaching his credibility, and the questions continued well beyond the point at which they could reasonably be construed as an attempt to refresh his memory. The State's extensive questioning of Garrett exceeded the scope of reasonable impeachment and amounted to the presentation of substantive evidence through the use of leading questions. Although the trial court reasonably concluded that Garrett was a hostile witness and that the State could cross-examine and impeach him, the court abused its discretion in allowing the State to present the entire substance of Garrett's prior statements to Det. Daugherty through leading questions. Moreover, no limiting instruction was given *at this time.* Such questioning raises concerns about the fairness of the trial.

{¶ 54} We will address the limiting instructions given by the trial court later in the

trial after we discuss the State's questioning of Johnigan as a court's witness and Det. Daugherty's testimony about Garrett's and Johnigan's prior statements, which are the subject of Johnson's seventh and eighth assignments of error.

## C. Calling Johnigan as a Court's Witness

{¶ 55} Johnson's seventh assignment of error alleges that the trial court erred in calling Demond Johnigan as a court's witness.  Like Garrett, Johnigan refused to testify in accordance with his plea agreement or to cooperate with the presentation of the State's case at Johnson's trial.   The State's questioning of Johnigan followed a pattern similar to that used to question Garrett.   However, Johnigan told the prosecutors the day before he was scheduled to take the stand that he was not going to testify, so the State was not surprised by the fact that his testimony was not as anticipated.   Also, unlike Garrett, Johnigan had previously testified under oath at Montgomery's trial.

{¶ 56}   After Garrett's testimony concluded, the State asked the court, outside the presence of the jury, to call Johnigan as a court's witness pursuant to Evid.R. 614(A). The prosecutor noted Johnigan's plea agreement to testify against his co-defendants and the fact that he had previously testified at Montgomery's trial.   The prosecutor also stated that he had met with Johnigan earlier in the week, and Johnigan had been cooperative. However, the previous day, Johnigan had informed the prosecutors that he "was going to refuse to testify pursuant to his plea agreement."   The prosecutors contacted Johnigan's attorney, who discussed with him how this choice would affect his plea agreement, but Johnigan continued to state that he would refuse to testify when called.   The State sought to call Johnigan as a court's witness so that it could cross-examine him.

{¶ 57}   Johnson objected to the State's motion to treat Johnigan as a court's

witness. Defense counsel stated: "[T]o allow the prosecutor to bring these witnesses in and to allow them to cross is somewhat unfair and the form of questions when they're asked by the prosecutor by use of cross is providing a narrative to indict my client in front of the jury based on the questions themselves * * *." (Trial Tr. 548.) In response, the prosecutor noted that Johnigan had indicated his refusal to testify at Johnson's trial, but that he had never denied that his prior testimony (in Montgomery's trial) was true, and it was unclear at that point what questions, if any, Johnigan would answer. (Trial Tr. 549). The trial court granted the State's motion and called Johnigan as a court's witness.

{¶ 58} Under Evid.R. 614(A), "[t]he court may, on its own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called." The purpose of calling a witness as a court's witness is to allow for a proper determination in a case where a witness is reluctant or unwilling to testify. *State v. Renner,* 2d Dist. Montgomery No. 25514, 2013-Ohio-5463, ¶ 18. "A witness whose appearance is important to the proper determination of the case, but who appears to be favorable to the other party, is a principal candidate for application of Evid.R. 614(A)." *State v. Croom*, 2d Dist. Montgomery No. 25094, 2013-Ohio-3377, ¶ 73, citing *State v. Curry,* 8th Dist. Cuyahoga No. 89075, 2007-Ohio-5721, ¶ 18. "When the court calls a witness on its own motion, a party need not satisfy the surprise and affirmative-damage requirements of Evid.R. 607(A) in order to impeach the witness." *State v. Slaughter*, 2d Dist. Montgomery No. 25215, 2014-Ohio-862, ¶ 4. The purpose of the rule is to prevent such a witness from testifying in a manner that is substantially at variance with the witness's prior statements, thereby causing the State to be "stuck" with having elicited testimony harmful to the State out of the mouth of its own witness. *State*

*v. Jones*, 2d Dist. Montgomery No. 14731, 1996 WL 38940, *4 (Jan. 31, 1996).

{¶ 59}  " 'As a practical matter courts will approach the exercise of the right to call witnesses with some degree of circumspection since merely presenting a person as the court's witness may clothe that witness with an enhanced measure of dignity and prestige' in the eyes of a jury and may be an 'unwarranted invasion of the adversarial system.' " *State v. Hazel*, 2d Dist. Clark No. 2011 CA 16, 2012-Ohio-835, ¶ 34, quoting *State v. Combs,* 9th Dist. Summit No. 15025, 1991 WL 259530, *2 (Dec. 4, 1991). However, the decision whether to call a court's witness pursuant to Evid.R. 614(A) is within the discretion of the trial court and will be reversed only for an abuse of discretion. *Id.* at ¶ 34; *Croom* at ¶ 74.

{¶ 60} Here, the State told the jury in its opening statement that Johnigan had been involved in the home invasion and murder, that he had entered a guilty plea, and that he had agreed to testify against others who were involved. The prosecutor indicated that Johnigan would testify and implicate Johnson. (Trial Tr. 285-286.)   Prosecutors did not learn that Johnigan would not cooperate until after they had already told the jury he would appear and testify.   Under these circumstances, we cannot say that the trial court abused its discretion by calling Johnigan as a court's witness.

{¶ 61}  As with Garrett, Johnson argues that the trial court should have held a hearing to determine whether or how Johnigan was going to testify before calling him as a court's witness.   Again, we are aware of no legal authority requiring this.   The court did listen to counsels' arguments in support and in opposition to calling Johnigan as a court's witness before deciding the issue. The defense did not ask the court to inquire of Johnigan himself before deciding to call him as a court's witness.   The trial court did not

err or abuse its discretion in failing to hold a separate hearing before deciding this issue.

{¶ 62} Johnson also objects to the extent and manner of the State's questioning of Johnigan, claiming that such questioning amounted to the presentation of substantive evidence. The court did not instruct the jury at the outset of Johnigan's testimony as to what a "court's witness" was or why the State was permitted to use leading questions.

{¶ 63} On the stand, Johnigan admitted that he had pled guilty to aggravated murder and other charges in this case. Johnigan denied knowing Montgomery, although he (Johnigan) had testified at Montgomery's trial about the involvement of Montgomery and others in the crime. Johnigan admitted that he knew Garrett and Crowder, but he denied knowing Johnson. After Johnigan testified that he did not know Johnson, the State asked Johnigan about his prior inconsistent statements to Det. Daugherty and about the inconsistent sworn testimony that he gave at Montgomery's trial.

{¶ 64} At first, Johnigan admitted that he had told Daugherty that he knew Johnson, but then he testified that he did not know Johnson. (Trial Tr. 560) After establishing this inconsistency, the State's questions followed a pattern similar to that used with Garrett, in which specific information was cited by the prosecutor about which Johnigan had previously testified or made statements to Det. Daugherty, and Johnigan denied the prior statement. For example:

Q:     Mr. Johnigan, we were talking about that previous trial in which you

testified. Do you remember being asked the question? Do you know a

guy by the name of Billy Johnson?

A:     No.

Q:     Do you remember answering yes?

A:      No.

PROSECUTOR:      541, line 6. May I approach, Your Honor?

THE COURT:      Yes.

Q:      Sir, I'm going to show you the transcript from that proceeding and direct your attention to line 6. Question, "Okay. Do you know a guy by the name of Billy Johnson?"   Answer, "Yes."   Do you remember saying that?

A:      No.

Q:      Do you deny that you said that?

A:      Yeah.

Q:      You deny that you said that in court?

A:      Uh-huh.

Q:      Is this transcript then -- I guess whoever typed this was lying about that question?

A:      I guess. Yeah.

(Trial Tr. 567.)

The prosecutor later asked:

Q:      Did you testify at the last proceeding that June [Johnson] and Trayvone [Montgomery] were in charge of this operation, that they were kind of the leaders?

A:      No.

Q:      No.   Do you remember being asked the question about whether or not there was a leader in this group?

A:      No.

[PROSECUTOR]: May I approach, Your Honor?

THE COURT: Yes.

[PROSECUTOR]: Page 556, line 16. Question, "Does there seem, Demond, like there's one or more people who are kind of in charge of the situation in terms of saying okay here's what's going to happen, here's what I'm going to or you're going to do? Is there one or more people that are kind of taking charge of this operation?" Answer, "It's two." "And who are those two people?" Answer, "Trayvone [Montgomery] and June [Johnson]."

Q: Do you deny that that's your testimony under oath?

A: Yeah.

(Trial Tr. 594-595.)

{¶ 65} Similar questioning continued for more than 60 pages of trial transcript, with the prosecutor quoting prior statements or testimony; Johnigan denied both that he had made the prior statements and the truth of those statements (i.e., that the events about which he was questioned had occurred in the manner suggested by the question). These statements directly contradicted Johnigan's prior testimony, and even defense counsel, in chambers, characterized Johnigan's testimony as "perjury." (Trial Tr. 623.) The transcript of his prior testimony was admitted "for the record," but was not given to the jury. (Trial Tr. 969.)

{¶ 66} The State's questioning of Johnigan encompassed many details of the crime and implied the content of his prior statements, including how the robbery was planned, how the weapons were obtained, how the victims' house was cased, how the

perpetrators communicated during the robbery, that Johnson was "in charge" of the group and provided the information about what would be found in the house, and how the events unfolded in the house during the robbery.

{¶ 67} Evid.R. 607(A), related to impeachment of a hostile witness, did not apply, because the State was not surprised by Johnigan's recantation (as it had been with Garrett). Evid.R. 613(B) did apply. It provides:

(B) Extrinsic evidence of prior inconsistent statement of witness. Extrinsic evidence of a prior inconsistent statement by a witness is admissible if both of the following apply:

(1) If the statement is offered solely for the purpose of impeaching the witness, the witness is afforded a prior opportunity to explain or deny the statement and the opposite party is afforded an opportunity to interrogate the witness on the statement or the interests of justice otherwise require; (2) The subject matter of the statement is one of the following:

(a) A fact that is of consequence to the determination of the action other than the credibility of a witness;

(b) A fact that may be shown by extrinsic evidence under Evid.R. 608(A), 609, 616(A), or 616(B);

(c) A fact that may be shown by extrinsic evidence under the common law of impeachment if not in conflict with the Rules of Evidence.

{¶ 68} " 'When extrinsic evidence of a prior inconsistent statement * * * is offered into evidence pursuant to Evid.R. 613(B), a foundation must be established through direct or cross-examination in which: (1) the witness is presented with the former statement; (2)

the witness is asked whether he made the statement; (3) the witness is given an opportunity to admit, deny or explain the statement; and (4) the opposing party is given an opportunity to interrogate the witness on the inconsistent statement.' " *State v. Robinson*, 2d Dist. Montgomery No. 26441, 2015-Ohio-1167, ¶ 27, citing *State v. Mack,* 73 Ohio St.3d 502, 514-515, 653 N.E.2d 329 (1995). If the witness admits making the conflicting statement, then there is no need for extrinsic evidence. If the witness denies making the statement, extrinsic evidence may be admitted, provided the opposing party has an opportunity to query the witness about the inconsistency, and provided the "evidence does not relate to a collateral matter[.]" *Id.* at ¶ 28, citing *State v. Pierce,* 2011-Ohio-4873, 968 N.E.2d 1019, ¶ 82 (2d Dist.).

{¶ 69} Under the circumstances presented, the State was permitted to impeach Johnigan with his prior inconsistent statements about his and Johnson's involvement in the case. The State was also permitted a reasonable opportunity to refresh Johnigan's recollection of his prior accounts. However, the extent and detail with which the State questioned Johnigan about his prior statements did more than attempt to refresh Johnigan's recollection and impeach his credibility; it presented, through the State's questioning, the complete version of events previously testified to or recounted by Johnigan. Where impeachment is used as a "subterfuge" to get evidence before the jury which is not otherwise admissible, it is improper. *State v. Arnold*, 189 Ohio App.3d 507, 2010-Ohio-5379, 939 N.E.2d 218, ¶45 (2d Dist.), quoting Annotation, *Calling and Interrogation of Witnesses by Court under Rule 614 of the Federal Rules of Evidence*, 53 A.L.R.Fed. 498, 500-501 (1981); *Slaughter*, 2014-Ohio-862, at ¶ 51. Many of the State's questions directly implicated Johnson and/or corroborated the version of events

suggested in the "impeachment" questioning of Garrett.

{¶ 70} The State was entitled to impeach Johnigan with his prior inconsistent statements about whether he knew Johnson and about Johnson's involvement in the home invasion. It was not permitted under Evid.R. 613(B), however, to lay out its whole theory of the case with questions about the specific content of Johnigan's prior statements. We agree with Johnson that such questioning effectively allowed the State to use Johnigan's prior inconsistent statements as substantive evidence. Moreover, no explanation or limiting instruction was given to the jury before, during, or immediately after the questioning of Johnigan.

**D. Daugherty's Testimony about Garrett's and Johnigan's Statements**

{¶ 71} Johnson's eighth assignment of error alleges that the trial court erred by allowing the State to ask Detective Daugherty about what Garrett and Johnigan told him during their interviews.

{¶ 72} As a preliminary matter, we emphasize that the alleged facts and admissions incorporated into the State's questions of Garrett and Johnigan did not constitute evidence (they denied the assertions contained within the questions). Although both men had made prior statements incriminating Johnson, those previous statements were not properly before the jury as substantive evidence. Evidence that has not been admitted cannot be impeached. To the extent that the State sought to use Daugherty's testimony about Garrett's and Johnigan's prior statements to impeach evidence not properly before the jury or to validate the accuracy of information contained in its questions, the testimony of Det. Daugherty was not proper.

{¶ 73} Det. Daugherty's testimony involving Johnigan was very brief. Daugherty

identified a copy of Johnigan's written plea agreement related to the offenses at issue, which Johnigan had signed along with Daugherty and others. Daugherty testified that his "understanding" of the plea agreement was that Johnigan had been "truthful" in making the statements upon which the agreement was based and that Johnigan would be truthful in the prosecution of others involved in the offenses. Daugherty also testified that 1) he (Daugherty) had personally observed and heard Johnigan's testimony at Montgomery's trial, 2) he "read along" with the transcript "as it was being discussed" with Johnigan on the stand at Johnson's trial, and 3) Johnigan's "testimony" (i.e., the questions asked of Johnigan at Johnson's trial about Johnigan's prior testimony at Montgomery's trial) accurately reflected the prior testimony. (Trial Tr. 729-730.) Daugherty did not testify in detail about the contradictions between Johnigan's prior statements and his testimony.

{¶ 74} In his testimony at Johnson's trial, Johnigan admitted to having made prior inconsistent statements to detectives about whether he knew Johnson. Johnigan denied having stated at Montgomery's trial that he knew Johnson; he attributed such a statement in the Montgomery transcript to a lie by the transcriptionist. He also denied having testified to his own involvement in the robbery and murder. Daugherty's limited testimony refuting Johnigan's assertions about Johnigan's prior statements to detectives and at trial was permissible.

{¶ 75} Det. Daugherty's testimony about Garrett's prior statements is more problematic, and it was much more extensive.

{¶ 76} The prosecutor referenced Garrett's denial that he knew Johnson and asked Det. Daugherty if Garrett ever told Daugherty that he knew Johnson. Daugherty

was allowed to testify that Garrett told Daugherty that he had known Johnson, who was his (Garrett's) niece's uncle. The defense objected, and a sidebar conference was held. At sidebar, the State indicated that it intended to question Daugherty about what Garrett had told Daugherty with respect to each of the subjects about which the prosecution had questioned Garrett the previous day and which Garrett had denied. The trial court agreed to allow such questioning, over the defense's objections, stating "[I]t's an impeachment." (Trial Tr. 712). The prosecutor was then permitted to ask, and Daugherty was permitted to answer, numerous questions with explicit detail about what Garrett had told Daugherty about the planning and commission of the home invasion.

{¶ 77} As discussed above, Evid.R. 613(B) permits extrinsic evidence of a prior inconsistent statement if "the witness is afforded a prior opportunity to explain or deny the statement and the opposite party is afforded an opportunity to interrogate the witness on the statement or the interests of justice otherwise require," and, as relevant here, "[t]he subject matter of the statement is * * * [a] fact that is of consequence to the determination of the action other than the credibility of a witness." "The use of prior inconsistent statements is limited. '[W]hen a prior inconsistent statement is offered for the purpose of impeachment, the trier of fact may only consider the prior statement as substantive evidence if the prior statement is not inadmissible as hearsay.' " *State v. Heard*, 1st Dist. Hamilton No. C-130789, 2014-Ohio-4643, ¶ 11; *State v. Hancock,* 1st Dist. Hamilton No. C-030459, 2004-Ohio-1492, ¶ 40, citing Evid.R. 801, 802, 803 and 804, and *Dayton v. Combs,* 94 Ohio App.3d 291, 640 N.E.2d 863 (2d Dist.1993).

{¶ 78} On cross examination, Garrett denied knowing Johnson or having made prior statements to Det. Daugherty about Johnson's role in the robbery and murder.

Johnson's role was a fact of consequence, and Garrett's testimony at Johnson's trial that Johnson had not been involved was subject to impeachment. The State was permitted to impeach Garrett's denial that Johnson had been involved in the robbery by presenting evidence (here, Daugherty's testimony) that Garrett had previously made a contradictory statement. But the impeachment should have stopped there. For purposes of Johnson's guilt, the specific facts surrounding the shooting of Hall inside the house were not of consequence; the State's theory of the case did not place Johnson inside the house.

{¶ 79} Although Garrett denied all the details of the crime contained in the State's questions about Johnson's involvement, his denials did not constitute evidence that was then subject to impeachment. Stated differently, the State's *questions* implying prior statements (by Garrett) that encompassed details of the events surrounding the robbery were not *testimony* by Garrett to those details, and the State was not entitled to impeach the denials with evidence of the content of prior statements. For example, there was no evidence (only the insinuation in the State's question) that Johnson had a leadership role in the planning, and thus the State was not permitted to "impeach" this suggestion. Accordingly, it was error for the trial court to allow unrestricted testimony by Daugherty about much of what Garrett had said previously.

{¶ 80} Moreover, Det. Daugherty's testimony about Garrett's prior statement was hearsay which did not fall within any recognized exception under Evid.R. 803. In some types of cases, such as domestic violence cases, there are many examples of police officers testifying about the prior inconsistent statements of a complainant who has since become uncooperative with the prosecution. But these cases generally involve excited

utterance or present sense impression exceptions to the hearsay rule.   *See, e.g., State v. Fry,* 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239; *Travis*, 165 Ohio App.3d 626, 2006-Ohio-787, 847 N.E.2d 1237.   Such exceptions are not present here.

**{¶ 81}**  In any case, if a witness made statements to a detective incriminating a defendant, but then, at trial, only the detective were called to relate those statements, a hearsay objection should be sustained, and the prior statements should not be heard by the jury.   The out-of-court statements of such a witness, when offered for the truth of the matter asserted, incriminate the defendant, are not made under oath, and are not subject to cross-examination.

**{¶ 82}**  In this case, Garrett was called by the State but then denied making prior statements to Det. Daugherty.   Yet, in scores of questions, the substance or alleged truth of what Garrett previously told Det. Daugherty was heard by the jury, because he (Garrett) denied at trial having told Daugherty such things previously.   Similarly, the substance of Johnigan's prior statements and testimony was implied in unrestricted questions and heard by the jury, notwithstanding Johnigan's denial on the stand of having made such statements.

**{¶ 83}**  The State was certainly entitled to an opportunity to refresh Garrett's and Johnigan's memories and to make a record for later prosecution of these witnesses based on the violations of their plea agreements.   In Johnigan's situation, he gave prior testimony under oath, subject to cross-examination, and, as an exception to the hearsay rules, some of that testimony was properly before the jury.   However, other parts of Johnigan's statements and most of Garrett's statements were heard by the jury as "impeachment" of statements which were not, themselves, before the jury.   The State

cannot do indirectly what it cannot do directly.

**{¶ 84}** The State claims that Johnson's counsel's objections on the basis of "hearsay" to the State's questioning of Garrett and Johnigan and to Det. Daugherty's testimony about Garrett's prior statements failed to preserve any error related to impeachment for appeal. We disagree. In our view, Daugherty's testimony about the content of Garrett's prior statements offered the content of an out-of-court statement for the truth of matter asserted therein, and thus was inadmissible hearsay under Evid.R. 802. Defense counsel's characterization that the State's questioning of Garrett and Johnigan relied on hearsay sufficiently stated his objection to the manner in which the State sought to impeach Garrett and Johnigan and to present its own version of events using out-of-court statements. The arguments raised on appeal regarding impeachment were not waived.

**{¶ 85}** In sum, we take no issue with the State's right to impeach the credibility of a witness who has made prior statements inconsistent with his or her trial testimony. The problem with Det. Daugherty's testimony about the statements of Garrett mirrors the problem with the extensive, detailed questioning of Garrett and Johnigan in the face of their repeated denials of having made prior statements about the crime: the questioning and testimony crossed the line between legitimate impeachment aimed at undercutting the credibility of a witness and offering substantive evidence by recounting the contradictory statements of that witness.

### E. Was Improper Testimony Harmless?

**{¶ 86}** Having found error in the questioning of Garrett and Johnigan and in the testimony of Det. Daugherty does not end the inquiry; we must determine whether the

improper questioning and improper impeachment evidence constituted harmless error.

**{¶ 87}** "[E]rror is harmless unless the substantial rights of a defendant have been affected." *State v. Harding*, 2d Dist. Montgomery No. 20801, 2006-Ohio-481, ¶ 24. The supreme court has recently set forth the following criteria for determining whether an error in the admission of evidence affected the defendant's substantial rights:

> First, it must be determined whether the defendant was prejudiced by the error, i.e., whether the error had an impact on the verdict. [*State v. Morris*, 141 Ohio St. 3d 399, 2014-Ohio-5052, 24 N.E.3d 1153] at ¶ 25 and 27. Second, it must be determined whether the error was not harmless beyond a reasonable doubt. *Id.* at ¶ 28. Lastly, once the prejudicial evidence is excised, the remaining evidence is weighed to determine whether it establishes the defendant's guilt beyond a reasonable doubt. *Id.* at ¶ 29, ¶33.

*State v. Harris,* 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, ¶ 37.

**{¶ 88}** The State argues that, even if the trial court erred in allowing extensive questioning about Garrett's and Johnigan's prior statements, such questioning was harmless beyond a reasonable doubt because: 1) Johnson confessed to the crime, and the prior statements of Garrett and Johnigan only corroborated his confession, and 2) the court gave limiting instructions to the jury as to the proper use of the impeachment testimony.

**{¶ 89}** The trial court addressed the jury three times about the limited use of prior inconsistent statements. The first was at the conclusion of Detective Daugherty's testimony in the State's case-in-chief. (Daugherty testified after Garrett and Johnigan.)

The trial court stated:

> Detective Daugherty was asked during his direct examination various questions about statements made by Trammell (sic) Garrett and Demond Johnigan during interviews, interviews with the police. Those -- you may conclude that the statements that those two witnesses made were inconsistent with the testimony or differed from the testimony they gave when they were called to this trial. That evidence is for what we call impeachment purposes. In other words, it relates to the credibility of those witnesses. If the statements made in the interviews differ -- of those two witnesses -- differ from the testimony given by those same witnesses in the courtroom, you consider that for the purpose of testing the credibility of those two witnesses. It is not offered for the substance. In other words, the acts that they were describing. It is not offered to prove the acts or the elements of this charged offense or charged offenses. It was for impeachment purposes. * * * (Trial Tr. 789-790)

The trial court included a similar instruction in its charge to the jury. (Jury Trial and Verdict Tr. 205-206).

{¶ 90} The third time the trial court addressed the issue was during deliberations, when the jury sent the following question to the court: "[C]an we consider testimony of Garrett and Johnigan that was read from a transcript of a previous trial, question mark. We don't think so, but wanted to double check." (Jury Trial and Verdict 240). The court, prosecutor, and defense counsel agreed on the following answer: "[Y]es, but for impeachment purposes only." The State contends that the court's limiting instructions

gave the jury appropriate guidance in the purposes for which it could consider the prior statements of Garrett and Johnigan, and that the jury's question to the court during deliberations demonstrates that the jurors did, in fact, understand the instruction that it could not consider either witness's prior inconsistent statements as substantive evidence. The State asserts that these instructions rendered harmless any error related to use of Garrett's and Johnigan's prior statements.

{¶ 91} Although limiting instructions were given, we cannot conclude that the extensive evidence about Johnson's role in the robbery – through questioning of Garrett and Johnigan and Detective Daugherty's testimony – was "harmless beyond a reasonable doubt." Johnson's confession only indicated that he was present for the planning of the robbery and expected to be rewarded with marijuana for his role as a lookout. It also suggested that his first awareness that the men were armed came when they returned to the van after the robbery and a gun fell on the floor. There was no physical evidence connecting Johnson to the crimes. Garrett's and Johnigan's statements indicated that Johnson had identified the victim, had given directions to the house, had been a leader of the group, and had been willing to threaten harm to a child as a means of effectuating the robbery, none of which Johnson had admitted. In these respects, the testimony and questioning about Garrett's and Johnigan's prior statements cast Johnson's behavior in a more culpable and nefarious light than his own confession. Under these circumstances, we are not persuaded beyond a reasonable doubt that the jury was able to ignore the improper evidence, which was a substantial part of the State's case, and that it would have reached the same conclusion if this evidence had not been presented.

{¶ 92} The sixth, seventh, and eighth assignments of error are sustained.

### F. Sufficiency of Evidence

{¶ 93} In his second assignment of error, Johnson alleged that the State presented insufficient evidence that he aided and abetted the offenses of which he was convicted.

{¶ 94} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law."  *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).  When reviewing whether the State has presented sufficient evidence to support a conviction, the relevant inquiry is whether any rational finder of fact, after viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt.  *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997).

{¶ 95} The Supreme Court of Ohio has rejected the position that a reviewing court should consider only properly admitted evidence to determine whether the State has presented sufficient evidence to support a conviction.  *State v. Brewer*, 121 Ohio St.3d 202, 2009-Ohio-593, 903 N.E.2d 284, ¶ 1, following *Lockhart v. Nelson*, 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988); *State v. Renner*, 2d Dist. Montgomery No. 25514, 2013-Ohio-5463, ¶ 8.  Rather, the reviewing court should consider all of the evidence admitted at trial, whether erroneously or not, and double jeopardy does not bar retrial where "trial error" resulted in the improper admission of evidence.  *Brewer* at ¶ 17-20. The Supreme Court recognized that the State "may rely upon the trial court's evidentiary

rulings in deciding how to present its case." *Brewer* at ¶ 19, citing *Lockhart*; *Renner* at ¶ 8; *see State v. Kareski*, 137 Ohio St.3d 92, 2013-Ohio-4008, 998 N.E.2d 410, ¶ 16.

{¶ 96} Based on the evidence presented at Johnson's trial, the jury could have reasonably found the essential elements of the crimes proven beyond a reasonable doubt. Thus, Johnson's conviction was supported by sufficient evidence.

### G. Mootness of Other Assignments

{¶ 97} Johnson's remaining assignments of error relate to the following: 1) weight of the evidence; 2) a *Batson* challenge; 3) juror misconduct; 4) prosecutorial misconduct; 5) sentencing on allied offenses of similar import; and 6) cumulative error. Because our finding of error related to the use of Garrett's and Johnigan's prior statements and testimony necessitates a new trial, these assignments of error are moot. The State's assignment of error related to the merger of the aggravated burglary and robbery convictions is also moot. Pursuant to App.R. 12(A)(1)(c), we need not address these assignments.

### III. CONCLUSION

{¶ 98} The trial court did not err in overruling Johnson's motion to suppress evidence. The judgment was also supported by sufficient evidence. For the reasons stated herein, however, the judgment will be reversed, and this matter will be remanded for further proceedings consistent with the opinion.

. . . . . . . . . . . . .

DONOVAN, J., concurs.

HALL, J., dissenting:

{¶ 99} I agree that the evidence in this case was legally sufficient to support the

verdicts of the jury. I further agree that the trial court was correct when it overruled Johnson's motion to suppress the statements he had made to the police. My disagreements involve the testimony of co-defendant Trammel Garrett, the testimony of co-defendant Demond Johnigan, and the conclusion that Detective Daugherty's testimony about prior inconsistent statements made by both Garrett and Johnigan constituted reversible error.

{¶ 100} The extraordinary turn of events during the testimony of co-defendants Garrett and Johnigan demonstrates surprise, affirmative damage and, in my view, is indicative of likely compromise of their testimony by threat, bribe, or both. During its opening statement, the prosecution had indicated that Trammel Garrett would testify that Johnson provided information about the victim of the robbery, helped plan the robbery, and served as a lookout in the van that transported Garrett and the others to the area. (Trial Tr. 285-286). On the morning of the day that Garrett was called to testify, the prosecutors met with him, and he gave no hint that he did not intend to honor his plea agreement to testify against others. Even defense counsel recognized the surprise. At the hearing that later was held regarding Johnigan, defense counsel said, "It's unfortunate for the State that their witness [Johnigan], as the last witness [Garrett] did, is now denying what he told previously to the State of Ohio * * *." (Trial Tr. 547-548). And at a sidebar held during Detective Daugherty's testimony, defense counsel said, "Yesterday Mr. Garrett was their witness. They were surprised, but he was still called by them." (*Id.* at 708).

{¶ 101} "Affirmative damage occurs when a party's own witness testifies to facts that contradict, deny or harm that party's trial position." *State v. Asher*, 112 Ohio App. 3d 646, 653, 679 N.E.2d 1147 (1st Dist.1996). Garrett's testimony that he did not know

Johnson and that Johnson was not involved in any way in the home invasion plainly contradicted his former statements to police and was contrary to the State's position.

{¶ 102} The questioning of Garrett, allowed by the trial court, served two distinct and independent purposes: first, to impeach Garrett's affirmative testimony that he did not even know his own accomplice, Billy Jack Johnson, and second, as a reasonable opportunity to confront Garrett with his prior statements in the hope that he would begin to testify truthfully. *See State v. Slaughter*, 2d Dist. Montgomery No. 25215, 2014-Ohio-862, ¶ 51 ("A witness often can be convinced to correct his or her trial testimony when confronted with a prior inconsistent statement and to adopt the inconsistent statement as the accurate rendition of facts."). The point of this questioning is not to "refresh his memory" but to pressure him into telling the truth. I acknowledge that the State's repeated questioning of Garrett concerning the details of the offenses about which he apparently told Detective Daugherty was longer and more extensive than I would have allowed for purposes of encouraging Garrett to tell the truth. It also was more than I would have allowed for impeachment to demonstrate Garrett's untruthfulness.[5] But in the context of the extraordinary, surprise testimony of this witness, as an apparent attempt to thwart the orderly presentation of evidence, the manner of allowed questioning is left to the sound discretion of the trial court. I cannot say that the trial court abused its discretion by allowing the State to question Garrett with his prior statements for the combined purpose to attempt to bring out the truth and to impeach him.

---

[5] In my opinion, it would have been better for the trial court to have conducted its own interrogation of Garrett, and later Johnigan, out of the presence of the jury, with the attendance of their own individual counsel who had negotiated their pleas including the obligation to testify. Both co-defendants had been transported from prison to the Montgomery County jail, where Johnson was confined, in order to testify at the trial. It is apparent that some intervening influence had occurred.

**{¶ 103}** Johnigan's testimony was even more extraordinary. He previously had testified under oath at the trial of co-defendant Roderick Montgomery. Prosecutors did not learn that Johnigan would not cooperate until after they already had told the jury he would appear and testify. The State informed the jury in its opening statement that Johnigan was involved in the home invasion and murder and that Johnigan entered a guilty plea, with an agreement to testify against others. The prosecutor indicated Johnigan would testify and implicate Johnson. (Trial Tr. 285) ("You're going to hear from Demond [Johnigan]. He's going to tell you about his involvement and the involvement of others.").

**{¶ 104}** When Johnigan took the stand, he initially testified that he had pled guilty to the murder and other charges. But he then denied knowing Montgomery, although he had testified at Montgomery's trial. (Exhibit 85, a transcript of Johnigan's testimony at Montgomery's trial, was preserved as part of the record but not admitted for jury consideration). Johnigan denied knowing Johnson and denied that Johnson was involved in the home invasion. The prosecutors sought to impeach him with the sworn testimony he had given at Montgomery's trial.[6] Johnigan consistently denied the truth of his prior testimony and eventually asserted that the transcription of his prior testimony was "a lie." (Tr. 562, 559, 562). Johnigan claimed at one point that he had no memory of testifying at Montgomery's trial. Later, Johnigan denied ever pleading guilty to Hall's murder. Even defense counsel believed that Johnigan was committing perjury, stating: "It appears to me last evening, as I was working this case a little more, that Mr. Johnigan appears to be

---

[6] I disagree with the majority's conclusion that the State was not surprised by Johnigan's testimony. S*upra,* ¶ 67. "Mr. Johnigan has never denied what he has testified previously to is true. He's never said that that's not true. He said that he was refusing to testify." (*Tr.* at 549). In my view, the State may have had a clue that something was amiss, but prosecutors nonetheless were surprised by the actual testimony as it unfolded.

committing perjury by giving false answers to previous sworn testimony to this Court on another case." (*Id.* at 623). As with Garrett, the questioning allowed by the trial court is more than I would have permitted, but the question is whether it was an abuse of discretion. I cannot say that the trial court abused its discretion by allowing the State to question Johnigan about his prior statements for the combined purpose to attempt to bring out the truth and to impeach him.

{¶ 105} I agree that Detective Daugherty's testimony was, in part, admitted in error. It is important to note that Garrett, an admitted accomplice, said he did not know Johnson but also eventually affirmatively testified that Billy Jack Johnson had nothing to do with the murder and that Johnson had stayed back at the house where the group had met that night and did not accompany the men on the trip to the home invasion. (Trial Tr. 539). That makes his testimony subject to impeachment. On the other hand, the defense acknowledged that Patrick Hall was killed when he was shot twice, witnessed by his girlfriend and one child. (Trial Tr. 290, 304). It is my belief that, for purposes of Evid.R. 613 impeachment by extrinsic evidence, whether Johnson was complicit by planning the offenses and accompanying the others in the van as a lookout were matters of consequence, but the explicit details of the home invasion were not. Accordingly, it was error for the trial court to allow wholesale testimony by Daugherty about what Garrett had said previously about the details of the home invasion. Moreover, at that point in the trial any rational juror already would have concluded that Garrett had no credibility whatsoever and any further impeachment was surplusage.

{¶ 106} Finding error, however, does not end the inquiry. The question is whether the otherwise-inadmissible extrinsic impeachment evidence constituted material

prejudice to Johnson. In *State v. Harding*, 2d Dist. Montgomery No. 20801, 2006-Ohio-481, ¶ 24, we stated: "Both Evid. R. 103(A) and Crim. R. 52(A) provide that error is harmless unless the substantial rights of a defendant have been affected." The Ohio Supreme Court analyzed evaluation of harmless error as follows:

First, there must be prejudice to the defendant as a result of the admission of the improper evidence at trial. "[A] judgment of conviction should not be reversed because of 'the admission * * * of any evidence offered against * * * the accused unless it affirmatively appears on the record that the accused was or may have been prejudiced thereby.' " [*State v.*] *Crawford*, 32 Ohio St.2d [254,] at 255, 291 N.E.2d 450 [1972], quoting R.C. 2945.83(C). *Compare State v. Abrams*, 39 Ohio St.2d 53, 56, 313 N.E.2d 823 (1974) (same requirement in considering improper judge-jury communications).

Second, an appellate court must declare a belief that the error was not harmless beyond a reasonable doubt. *Id.; Crawford; Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *State v. Bayless*, 48 Ohio St.2d 73, 106, 357 N.E.2d 1035 (1976), *vacated in part on other grounds*, 438 U.S. 911, 98 S.Ct. 3135, 57 L.Ed.2d 1155 (1978); *accord State v. Lytle*, 48 Ohio St.2d 391, 358 N.E.2d 623 (1976), paragraph three of the syllabus ("Error in the admission of other act testimony is harmless when there is no reasonable possibility that the testimony

contributed to the accused's conviction"), *vacated in part on other grounds*,

438 U.S. 910, 98 S.Ct. 3135, 57 L.Ed.2d 1154 (1978).

Third, in determining whether a new trial is required or the error is harmless beyond a reasonable doubt, the court must excise the improper evidence from the record and then look to the remaining evidence. In a case dealing with the improper admission of privileged spousal testimony, we stated that " 'the cases where imposition of harmless error is appropriate must involve either overwhelming evidence of guilt or some other indicia that the error did not contribute to the conviction.' " *State v. Rahman*, 23 Ohio St.3d 146, 151, 492 N.E.2d 401 (1986), quoting *State v. Ferguson*, 5 Ohio St.3d 160, 166, 450 N.E.2d 265 (1983), fn. 5.

*State v. Morris*, 141 Ohio St. 3d 399, 406-07, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 27-29. *See also State v. Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, ¶ 37.

**{¶ 107}** In my view, the introduction of prior inconsistent statements of Trammel Garrett undoubtedly was not considered by the jury as substantive evidence and was harmless for three reasons. First, Johnson's confession that he assisted in the planning and the trip for commission of the home invasion, and that he expected to receive some of the marijuana for his efforts, was uncontested. Both Detective Timothy Bilinski and FBI Special Agent Timothy Ferguson testified that Johnson admitted these facts. Johnson did not testify, but during his statements to these investigators he identified pictures of Garrett, Johnigan, and others who unquestionably had participated in the home invasion. Therefore, Johnson's own statements were not only contradictory to the contorted testimony of Garrett and Johnigan, but they establish his own involvement in the events.

Second, Garrett's testimony was already incredibly unbelievable before Daugherty's testimony. Garrett agreed he pled guilty for his involvement in the killing of Patrick Hall, yet he denied almost every detail testified to by the victim's family. Most preposterous, Garrett denied knowing Johnson, but he said that at the time of the home invasion, Johnson stayed back at the house where the planning took place. Therefore, questions and answers about what Garrett, or Johnigan, said to Daugherty about Johnson's participation in the robbery have little, if any, more impact on the co-defendant's credibility. Third, repetition of the details that Garrett told Daugherty is prejudicial to Johnson only if there is a reasonable possibility that the jury could have considered the details as substantive evidence, which it undoubtedly did not. As pointed out in the lead opinion, the court addressed the limited use of prior inconsistent statements three times, the last of which is most illuminating. The jury asked: "[C]an we consider testimony of Garrett and Johnigan that was read from a transcript of a previous trial, question mark. *We don't think so, but wanted to double check.*" (Jury Trial and Verdict 240) (Emphasis added).[7] The court, prosecutor, and defense counsel agreed on the following answer: "[Y]es, but for impeachment purposes only." (*Id.*). The jury's question confirms that it understood and was able to follow the court's instructions. If this case had been a trial to the bench, with the exact same testimony, we likely would conclude that the trial court was able to separate impeachment questioning from substantive evidence. Here we have proof that the jury did the same. Accordingly, on this record, I conclude the extrinsic evidence of prior inconsistent statements does not constitute reversible error.

---

[7] Garrett's prior statements were not from a previous trial, of course, but the jury's question indicates it understood that it could not consider either witness's prior inconsistent statements as substantive evidence.

. . . . . . . . . .

Copies mailed to:

Mathias H. Heck
Carley J. Ingram
David R. Miles
Hon. Timothy N. O'Connell