[Cite as *State v. Bagley*, 2019-Ohio-3193.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

STATE OF OHIO                              :
                                           :
     Plaintiff-Appellee                  :     Appellate Case No. 28195
                                           :
v.                                         :     Trial Court Case No. CRB 1700451
                                           :
ANTONETTE BAGLEY                           :     (Criminal Appeal from
                                           :      Municipal Court)
     Defendant-Appellant                 :
                                           :

. . . . . . . . . . .

O P I N I O N

Rendered on the 9th day of August, 2019.

. . . . . . . . . . .

CHRISTOPHER B. EPLEY, Atty. Reg. No. 0070981, 245 James Bohanan Memorial Drive, Vandalia, Ohio 45377
     Attorney for Plaintiff-Appellee

KIRSTIN L. ARNOLD, Atty. Reg. No. 0088794, 120 West Second Street, Suite 1717, Liberty Tower, Dayton, Ohio 45402
     Attorney for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} Antonette Bagley was convicted after a bench trial in the Vandalia Municipal Court of four counts of patient endangerment, a first-degree misdemeanor. Bagley appeals, claiming that her convictions were based on insufficient evidence. For the following reasons, the trial court's judgment will be affirmed.

## I. Factual and Procedural History

{¶ 2} The evidence at trial established the following facts.

{¶ 3} In July 2015, Bagley was an employee of Good Samaritan Homes, which provides care for people with developmental disabilities. Bagley was a staff person at a group home with four women. Her duties consisted of ensuring the health and safety of the residents, assisting them with their activities of daily living, providing medication, transporting them to appointments, and the like. Bagley's shift was from 4:00 p.m. to midnight (second shift). Another staff person worked from 1:00 p.m. to 8:00 p.m., and thus the home was double-staffed for the first four hours of Bagley's shift. Bagley worked alone from 8:00 p.m. to midnight. Bagley was relieved by Jennifer Wheeler, who worked at the group home from midnight to 8:00 a.m. (third shift).

{¶ 4} Roshawnda Smith, home manager at Good Samaritan Homes, testified that staff persons were not supposed to leave until they were relieved by the next staff person. When the next shift arrives, the two staff people were to count the money in the home, do a walk-through of the house together, and discuss anything from the shift that the relief staff needed to know. Smith stated that staff were trained to follow a chain of command to obtain coverage if an emergency arose and the staff person needed to leave unexpectedly. Smith emphasized that the residents were to be supervised at all times

and were not to be left alone. Consequently, a staff person was not allowed to leave until a replacement arrived.

{¶ 5} The group home where Bagley and Wheeler worked was a three-bedroom, single-floor home. Wheeler described the home as having a foyer, living room, dining room, den, and back patio. Staff were permitted to smoke at the end of the driveway away from the house, but only if another staff person were present to supervise the residents.

{¶ 6} The women at the group home had individual service plans (ISPs), which detailed their disabilities and how staff was to provide services for them; two of the ISPs were admitted as exhibits. The ISP for one resident indicated that she had the following diagnoses: mild mental retardation, spastic quadriplegia, history of seizure disorder, cerebral palsy, flexion contractures of hips and knees, stasis edema, hypertension, degenerative arthritis, dysfunctional uterine bleeding, hyperglobulinemia, constipation, and osteoporosis. This resident's condition rendered her entirely dependent on staff to get up, dress, eat, shower, take medications, and address her bodily functions.

{¶ 7} The other three women were ambulatory, but prone to falling; Smith testified that "they trip and fall, they fall a lot." The second ISP indicated that one of these three residents had mental retardation, anxiety, panic attacks, hidradenitis, seizures, cellulitis, and was recently diagnosed with Parkinson's Disease. None of the women was able to cook for herself. Staff assisted all the women with cooking, bathing, medication, and when they needed to use the bathroom during the night.

{¶ 8} On July 29, 2015, Bagley clocked in at 5:24 p.m., which was nearly 90 minutes late. She did not clock out. Smith testified that the women in the group home

took medicine at 7:00 p.m., went to bed at 8:00 p.m., and were asleep by 8:30 p.m. Bagley's time card was adjusted for payroll purposes to show that she left at 9:00 p.m., but Smith acknowledged that she did not know when Bagley actually left the home.

{¶ 9} Wheeler testified that she arrived at the group home at 11:40 p.m. on July 29, 2015 in preparation for her midnight to 8:00 a.m. shift.[1]   Wheeler did not see Bagley's vehicle.   Wheeler stayed in her car for a few minutes, and then approached the home. She rang the doorbell and knocked on the door (the staff do not have keys to the home), but Bagley did not answer.   Wheeler continued to knock on the door and ring the doorbell until one of the residents woke and acknowledged her.   That resident called to one of the other women, who let Wheeler in.   Wheeler was in the home by 11:50 p.m. or 11:56 p.m. Wheeler walked through the home and checked the patio door (a slider); she did not see Bagley in the home or on the back patio when she arrived.   Wheeler testified that the residents were shocked, because they did not realize that they were alone.   Wheeler testified that Bagley was supposed to be watching them.

{¶ 10} Wheeler received several text messages from Bagley that night.   The first two were received at 11:56 p.m. and 11:57 p.m. on July 29, 2015, and said, "Jennifer this is [A]nnie from [group home's name.]"   At 12:05 a.m. on July 30, Bagley texted, "The keys are under the mat.   I had to leave[.]"   At 12:09 a.m., Bagley texted, "Call me when u can[.]"   Finally, at 1:14 a.m., Bagley texted, "U can leave that laundry for me ill do it

---

[1] The testimony was inconsistent about whether Wheeler clocked in for her shift.   Her time card (State's Ex. 4) showed that she clocked in at 12:00 a.m. on July 30, 2015 and clocked out at 8:09 a.m. that day; Wheeler's time card for July 29 had no clock in or clock out time.   The testimony was confusing as to whether Wheeler's time for the shift at issue would have been recorded on July 29 or July 30.   Regardless, Smith's and Wheeler's testimony established that Wheeler arrived for her shift for the morning of July 30 (midnight to 8:00 a.m.), as scheduled.

2morrw[.]"

{¶ 11} Wheeler testified that none of the women had suffered any injury. Wheeler stated, however, that the woman with quadriplegia had a soiled diaper when Wheeler arrived and needed to be changed.

{¶ 12} Wheeler contacted Smith, and Smith advised her to call the police. After receiving Wheeler's call, Smith came to the scene and provided a statement to the responding officer. Bagley's employment was terminated due to her leaving early from her shift.

{¶ 13} Joseph Kaufman, an investigator with the Montgomery County Board of Developmental Disabilities Services, conducted a neglect investigation concerning a report that Bagley had left several individuals in a group home unsupervised. Kaufman reviewed the residents' ISPs, interviewed the residents, staff members, and Bagley. Kaufman testified that Bagley stated that she was at the group home for her entire shift; Bagley reported to Kaufman that she went onto the back patio at 11:15 p.m. and was outside talking on her phone and smoking when Wheeler came to relieve her. Bagley asserted that she clocked out at approximately 12:10 a.m. and then left to go home. Kaufman testified that Bagley's statements were not corroborated and were inconsistent with his findings. On cross-examination, Kaufman stated that there was no indication or sign that any of the residents was injured or had complications as a result of the neglect. He also could not state with certainty how long the residents were left unsupervised. However, based on his findings, Kaufman filed a complaint for patient endangerment against Bagley with the police.

{¶ 14} On February 23, 2017, Bagley was charged by complaint with four counts

of patient endangerment, in violation of R.C. 2903.341, first-degree misdemeanors. The matter proceeded to a bench trial on July 24, 2018 and August 23, 2018, during which Smith, Kaufman, and Wheeler testified for the State. Bagley did not testify or present any witnesses on her behalf. The trial court found Bagley guilty of the charges.

{¶ 15} On October 1, 2018, the trial court sentenced Bagley to 180 days in jail with 170 days suspended, five years of probation, a $50 fine, and court costs. The trial court offered to allow Bagley to do 90 days of house arrest in lieu of jail, but Bagley elected to serve the 10 days in jail. Bagley did not seek a stay pending appeal, and the record reflects that Bagley has served her 10-day jail term. Nevertheless, it appears that she has not completely paid her court costs and fine, and thus her appeal is not moot. *See, e.g., State v. Ruley*, 2d Dist. Miami No. 2017-Ohio-10, 2018-Ohio-3201, ¶ 10; *State v. Laster*, 2d Dist. Montgomery No. 25019, 2013-Ohio-621, ¶ 3, fn.1.

## II. Sufficiency of the State's Evidence

{¶ 16} In her sole assignment of error, Bagley claims that the State's evidence was insufficient to convict her of patient endangerment.

{¶ 17} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The relevant inquiry is whether any rational finder of fact, after viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). A guilty verdict will not be disturbed on appeal

unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id.*

{¶ 18} In reviewing challenges based on the sufficiency (and/or manifest weight) of the evidence, we are required to consider all of the evidence admitted at trial, regardless of whether it was admitted erroneously. *State v. Brewer*, 121 Ohio St.3d 202, 2009-Ohio-593, 903 N.E.2d 284; *State v. Rosales*, 2d Dist. Montgomery No. 27117, 2018-Ohio-197, ¶ 16, citing *State v. Johnson*, 2015-Ohio-5491, 55 N.E.3d 648, ¶ 95 (2d Dist.).

{¶ 19} Bagley was found guilty of patient endangerment, in violation of R.C. 2903.341(B). At the time of the offense in 2015, R.C. 2903.341(B) provided: "No MR/DD caretaker shall create a substantial risk to the health or safety of a mentally retarded person or a developmentally disabled person."[2]

{¶ 20} An "MR/DD caretaker" was defined as "any MR/DD employee or any person who assumes the duty to provide for the care and protection of a mentally retarded person or a developmentally disabled person on a voluntary basis, by contract, through receipt of payment for care and protection, as a result of a family relationship, or by order of a court of competent jurisdiction. 'MR/DD caretaker' includes a person who is an employee of a care facility and a person who is an employee of an entity under contract with a provider." Former R.C. 2903.341(A)(1).

{¶ 21} R.C. 2903.341(A)(3) incorporated the definitions of "mentally retarded person" and "developmentally disabled person" from R.C. 5123.01. "Mentally retarded person" meant "a person having significantly subaverage general intellectual functioning

---

[2] R.C. 2903.341(B) now reads: "No developmental disabilities caretaker shall create a substantial risk to the health or safety of a person with a developmental disability." In general, the October 2016 revisions to R.C. 2903.341 replace "mentally retarded person" and "developmentally disabled person" with "person with a developmental disability." The term "developmental disability" now includes intellectual disability. R.C. 5123.01(Q).

existing concurrently with deficiencies in adaptive behavior, manifested during the developmental period." Former R.C. 5123.01(N). A "developmentally disabled person" was a person with a developmental disability. Former R.C. 5123.01(R). A "developmental disability" was (and is currently) defined as "a severe, chronic disability" that is characterized by:

(1) It is attributable to a mental or physical impairment or a combination of mental and physical impairments * * *.

(2) It is manifested before age twenty-two.

(3) It is likely to continue indefinitely.

(4) It results in one of the following:

* * *

(c) In the case of a person six years of age or older, a substantial functional limitation in at least three of the following areas of major life activity, as appropriate for the person's age: self-care, receptive and expressive language, learning, mobility, self-direction, capacity for independent living, and, if the person is at least sixteen years of age, capacity for economic self-sufficiency.

(5) It causes the person to need a combination and sequence of special, interdisciplinary, or other type of care, treatment, or provision of services for an extended period of time that is individually planned and coordinated for the person.

R.C. 5123.01(Q).

{¶ 22} "Substantial risk" means a strong possibility, as contrasted with a remote or

significant possibility, that a certain result may occur or that certain circumstances may exist. R.C. 2901.01(A)(8).

{¶ 23} On appeal, Bagley claims that the State failed to present sufficient evidence that she recklessly created a substantial risk to patients, because (1) there was no evidence at trial regarding the creation and validity of each patient's ISP and (2) there was insufficient evidence that she left the group home prior to the end of her scheduled shift.

{¶ 24} Viewing the evidence in the light most favorable to the State, we conclude that the State presented sufficient evidence to support Bagley's convictions for patient endangerment. The State's evidence established that Bagley was an "MR/DD caretaker," whose regular shift was 4:00 p.m. to midnight at a group home for people with development disabilities. Smith's, Kaufman's, and Wheeler's testimony, in addition to the two ISPs submitted as evidence, indicated that at least two of the women had mental retardation and that all four women in the group home had developmental disabilities.

{¶ 25} Bagley argues that the State should have offered expert testimony about the creation and validity of the ISPs, and that this evidence was necessary to link Bagley's early departure to an alleged substantial risk to the women's health and safety. Bagley has not cited to any authority that requires the State to present expert testimony as to the accurate creation and validity of an ISP for the person with developmental disabilities, and we have found none.

{¶ 26} The State's evidence indicated that the women in the group home required constant supervision. Several witnesses testified that one women had quadriplegia, was completely dependent on the caregiver for assistance with activities of daily living, and

required assistance in using the bathroom in the middle of the night. Other residents required similar assistance during the night and were prone to falling. Due to Bagley's absence, one of the women, who was prone to falling, came to the door unsupervised to let Wheeler into the home. Upon entering the home, Wheeler found that the woman with quadriplegia was "soaking wet" and needed her diaper changed. Although there was no evidence that the women suffered physical harm from Bagley's absence, the State's evidence was sufficient for the trial court, as the finder of fact, to conclude that her absence created a *substantial risk* of harm to the residents. We note that it was the province of the trial court, as the fact-finder, to determine the weight to be given to the testimony and the ISPs presented by the State in determining whether each woman at the group home was either a "mentally retarded person or a developmentally disabled person."

**{¶ 27}** The State's evidence was also sufficient to establish that Bagley, in fact, left the group home prior to the end of her scheduled shift. Wheeler testified that she arrived at the group home at 11:40 p.m. She did not see Bagley's vehicle while she was there. Wheeler approached the home before midnight, and she repeatedly banged on the door and rang the doorbell without any response from Bagley. Ultimately, one of the home's residents opened the door for Wheeler. Wheeler testified that she checked the house, including the back patio door; she did not see Bagley there. The texts from Bagley to Wheeler also indicated that Bagley left the residence prior to communicating with Wheeler in person, as required by Good Samaritan Homes policy. Although the State was unable to present evidence as to the exact time that Bagley left the group home, there was sufficient evidence that Bagley left the home prior to both the end of her shift and

Wheeler's arrival. Based on the evidence concerning the condition of the women in the group home and that they required constant supervision, the trial court had sufficient evidence to conclude that Bagley's absence created a substantial risk of harm to the women.

**{¶ 28}** Bagley's assignment of error is overruled.

### III. Conclusion

**{¶ 29}** The trial court's judgment will be affirmed.

. . . . . . . . . . . .

DONOVAN, J. and TUCKER, J., concur.


Copies sent to:

Christopher B. Epley
Kristin L. Arnold
Hon. Cynthia M. Heck